CHAMBERS-DOBSON, INC., A NEBRASKA CORPORATION, APPELLEE AND CROSS-APPELLANT, V. CHARLES D. SQUIER, APPELLANT AND CROSS-APPELLEE.

472 N.W.2d 391

Filed July 26, 1991.   No. 89-124.

Gene T. Oglesby, of Oglesby, Brown, Thomas, Peterson & Orton, for appellant.

David R. Buntain and Sonya S. Ekart, of Cline, Williams, Wright, Johnson & Oldfather, for appellee.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

Chambers-Dobson, Inc., brought an action against Charles D. Squier to enjoin him from engaging in certain insurance business, in violation of covenants not to compete with Chambers-Dobson. From permanent injunctions granted by the district court for Lancaster County and a judgment for damages, Squier appeals. Chambers-Dobson cross-appeals. We affirm.

## STANDARD OF REVIEW

An injunction is a remedy available through an equity action. *Burton v. Annett*, 215 Neb. 788, 341 N.W.2d 318 (1983). In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where credible evidence is in conflict on a material issue of fact, an appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Hughes v. Enterprise Irrigation Dist.*, 226 Neb. 230, 410 N.W.2d 494 (1987); *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 458 N.W.2d 443 (1990); *American Sec. Servs. v. Vodra*, 222 Neb. 480, 385 N.W.2d 73 (1986). See, also, Neb. Rev. Stat. § 25-1925 (Reissue 1989).

## SALE TO CHAMBERS-DOBSON

Squier-McCashland Agency, a general partnership composed of Squier and Richard H. McCashland, was located in Lincoln, Nebraska, and operated as a general insurance agency and insurance brokerage business. On January 14, 1983, Squier, McCashland, and Chambers-Dobson signed an "Agreement to Purchase Assets" for sale of partnership assets to Chambers-Dobson for $189,825, which was allocated as follows: $5,825 for tangible property, $10,000 for goodwill, and $174,000 for an expiration list of the partnership's customers. In reference to the customer list of the Squier-McCashland Agency as an item of property, Chambers-Dobson, Squier, and McCashland considered an estimate submitted by an independent source and accepted 7 years as the "useful life" of the customer accounts reflected on the expiration list of customers. In addition to entitling Chambers-Dobson to use the name "Squier-McCashland Agency," the agreement also obligated Chambers-Dobson to pay Squier and McCashland $20,000, for which both Squier and McCashland promised that

for the period through 1990, or for so long as Buyer, its transferees or assigns are engaged in the operation of a general insurance agency and insurance brokerage business using the customer lists and other expirations which are purchased by the Buyer herein, whichever period is less, the Seller, Charles D. Squier and Richard H. McCashland, jointly and severally agree that neither the Seller nor any of the named individuals personally will in any manner, directly or indirectly, whether through agents, employees, corporations or through any means whatsoever, at any location solicit or receive applications for or write policies of insurance to or on account of any person, firm or entity with whom Seller has policies of insurance in force as of the date of closing . . . .

Contemporaneous with the "Agreement to Purchase Assets," Squier, on January 14, 1983, signed an "Employment Agreement" with Chambers-Dobson, an agreement which, in relevant part, provided:

In recognition of the facts that the Employer is engaged in a personal service business involving confidential

information and personal relationships with insureds, the success of which business is in large part due to the exclusive retention of such confidential information and undisturbed continuation of such personal relationships with insureds, the Employee does hereby covenant and agree as follows and acknowledges that the following covenants are reasonably necessary for the protection of the Employer and may be enforced to the extent set forth herein or to such extent as any court of competent jurisdiction may deem reasonable and proper:

(a) The Employee agrees that all information concerning the insurance of the Employer's clients, including expiration data in connection therewith, is confidential information constituting trade secrets and will be treated by him as such, and that both during and after the term of his employment, however, it may be terminated, he will not, directly or indirectly, on his own behalf or on behalf of anyone else, make use of such information concerning the Employer's business nor divulge such information to anyong [sic] nor retain or create any lists of the Employer's customers for his own personal use nor reveal the same to anyone.

(b) The Employee covenants and agrees that during the period of his employment hereunder he will not, directly or indirectly, on his own behalf or on behalf of anyone else, compete with the Corporation in any manner, and that for a period of forty-eight (48) months after the termination of his employment hereunder, however caused, he will not, directly or indirectly, solicit, attempt to obtain or accept insurance business from any of the Employer's customers nor act in the capacity of an adviser, consultant or risk manager to said customers, nor directly or indirectly, aid or assist anyone else in the solicitation of insurance business from such customers.

Squier and Chambers-Dobson later modified the term of the restrictive covenant to 24 months.

## SQUIER'S EMPLOYMENT WITH CHAMBERS-DOBSON

In January 1983, pursuant to the employment agreement,

Squier entered employment with Chambers-Dobson, where he served as an account executive, a personal "lines" or accounts manager, and a unit representative on the agency operations committee. One of Squier's responsibilities was "marketing personal lines," which involved soliciting new customers and assisting present customers of Chambers-Dobson and which afforded Squier access to some 2,600 Chambers-Dobson customers. In 1987, Squier informed Chambers-Dobson that he wanted to purchase his former business and terminate his employment at Chambers-Dobson. When the parties were unable to agree, Squier terminated his employment on December 7, 1987, and started a new insurance agency without any preexisting accounts. Shortly after Squier started his new agency, at least 19 Chambers-Dobson customers transferred their insurance business, represented by 63 policies, to Squier in his new agency. Also, Squier was the agent for the issuance of new policies to at least 20 customers, formerly with the Squier-McCashland Agency and involved in the Chambers-Dobson purchase of that agency.

## CHAMBERS-DOBSON'S ACTION AND THE TRIAL

On December 21, 1987, Chambers-Dobson filed an equity action, seeking injunctive relief and damages. At trial on September 14, 1988, Chambers-Dobson presented evidence relative to the requested injunction and damages. Evidence developed that the personal relationship between a policyholder and the insurance agent is important in the operation of an insurance agency. Chambers-Dobson conducted a "marketing operation" for assembly of personal data concerning a prospective customer. This information was available to Chambers-Dobson "account executives" or agents before any contact with a prospective insurance customer. The expiration date for an existing insurance policy is important because this information enables an agent to attend to insurance needs of a policyholder who is anticipating expiration of existing insurance coverage. Continuity of coverage is an essential element in the "confidential personal relationship" between an insurance customer and an insurance agent. Squier had access to information required for the "continuing business" of many

Chambers-Dobson customers. Also, as a personal lines manager, Squier had direct contact with Chambers-Dobson's "individual files" on customers who had special problems, such as "underwriting questions." Chambers-Dobson also offered evidence concerning damages sustained as the result of Squier's engaging in the insurance business notwithstanding the covenants not to compete.

Squier acknowledged that, among customers of his insurance agency after departure from Chambers-Dobson, 20 policyholders were former customers of · the Squier-McCashland Agency and 19 had been customers of Chambers-Dobson.

## THE INJUNCTIONS
On December 5, 1988, on the basis of the restrictive covenant in the sale agreement, the district court permanently enjoined Squier from "soliciting or receiving applications for or writing policies of insurance to or on account of any person, firm or entity with whom he or the Squier-McCashland Agency had policies of insurance in force" at the effective date of the "Agreement to Purchase Assets." This injunction remained effective "until January 31, 1990." Further, concerning the noncompetition covenant in Squier's employment contract, the district court permanently enjoined Squier from "(a) soliciting, attempting to obtain, accepting insurance business from any of [Chambers-Dobson's] customers; (b) acting in the capacity of an advisor, consultant or risk manager to said customers or (c) aiding or assisting anyone else in the solicitation of insurance business from such customers." This injunction remained in effect until December 1, 1989. Finally, the district court awarded damages to Chambers-Dobson.

## ASSIGNMENTS OF ERROR
Squier claims that the district court erred in failing to find that the covenants not to compete are invalid and in issuing injunctions to enforce the restrictive covenants. Although Squier has assigned error to the judgment for damages, he has not discussed the nature of error claimed in reference to the damages award. "To be considered by the Supreme Court, an error must be assigned and discussed in the brief of one

claiming that prejudicial error has occurred." *Federal Land Bank of Omaha v. Victor*, 232 Neb. 351, 355, 440 N.W.2d 667, 670 (1989). Accord *Wells Fargo Ag Credit Corp. v. Batterman*, 229 Neb. 15, 424 N.W.2d 870 (1988). See, also, Neb. Ct. R. of Prac. 9D(1)g (rev. 1989). Consequently, we consider only Squier's contention regarding the injunctions issued on the basis of the restrictive covenants.

## NONCOMPETITION COVENANT;
## SALE OF GOODWILL

[I]t has been believed to be for the general welfare that a merchant should have the power to transfer his business as a going concern with its good will. This makes the good will an "asset" convertible into money or other commodities. . . . [I]f there is harm to the seller in disabling himself from carrying on a similar business, it is in no respect different from the harm that he suffers when he transfers his building and stock in trade. For his good will as for his other property he receives an agreed equivalent that he believes to be of equal or greater advantage. . . .

The restraint of trade that is permissible in accordance with the foregoing argument is no greater than is necessary to attain the desired purpose—the purpose of making good will a transferable asset. It is lawful for the seller to restrict his own freedom of trade only so far as is necessary to protect the buyer in the enjoyment of the good will for which he pays. The restraint on his own freedom must be reasonable in character and in extent of space and time.

6A A. Corbin, Corbin on Contracts § 1385 at 47-48 (1962). See, also, Restatement (Second) of Contracts § 188, comment *b.* at 42 (1981):

Where a sale of good will is involved . . . the buyer's interest in what he has acquired cannot be effectively realized unless the seller engages not to act so as unreasonably to diminish the value of what he has sold. . . . [C]ourts have generally been more willing to uphold promises to refrain from competition made in connection with sales of good will than those made in connection with

contracts of employment.

In *Swingle & Co. v. Reynolds*, 140 Neb. 693, 1 N.W.2d 307 (1941), this court recognized that a noncompetition covenant, included as a provision in a contract for sale of a business, may be valid and observed:

> The defendant well knew that the restrictive covenant was essential to the consummation of the deal. It is almost intolerable that a person should be permitted to obtain money from another upon solemn agreement not to compete for a reasonable period within a restricted area, and then use the funds thus obtained to do the very thing the contract prohibits. Unless such contract be against the public interest, the parties should be held to their engagements.
>
> It must be admitted by a practical consideration of the subject that any restrictive covenant of this nature does to some extent eliminate competition and tend toward monopoly. Any statement to the contrary simply fails to consider its practical aspects. Also, it may be said that such contracts are generally made for the very purpose of eliminating some competition. To state it otherwise would require us to overlook actualities in modern business methods. We think the plaintiff had a right to purchase defendant's property and business for the very purpose of eliminating him as a competitor, and the contract being in all respects the voluntary act of the parties and free from misrepresentation and fraud, it is binding unless it contravenes the public interest.

140 Neb. at 695-96, 1 N.W.2d at 309. See, also, *D. W. Trowbridge Ford, Inc. v. Galyen*, 200 Neb. 103, 262 N.W.2d 442 (1978) (in a contract for sale of a business, a reasonable restrictive covenant against the seller's competition in the type of business sold may be enforced). Thus, a covenant not to compete which is contained in a contract for sale of a business is a seller's self-imposed restraint from trade and is frequently necessary to make goodwill in the seller's business a transferable asset and ensure that the buyer receives the full value of acquired goodwill.

NONCOMPETITION COVENANT;
EMPLOYMENT CONTRACT

Concerning enforcement of a postemployment restraint on competition by a former employee, the preliminary question is whether the restraint is necessary to protect the employer in some legitimate interest. *Boisen v. Petersen Flying Serv.*, 222 Neb. 239, 383 N.W.2d 29 (1986); *Brewer v. Tracy*, 198 Neb. 503, 253 N.W.2d 319 (1977); *Diamond Match Div. of Diamond International Corp. v. Bernstein*, 196 Neb. 452, 243 N.W.2d 764 (1976); *Securities Acceptance Corp. v. Brown*, 171 Neb. 406, 106 N.W.2d 456 (1960).

Regarding a noncompetition covenant in an employment contract, this court has stated:

"It is clear that if the nature of the employment is such as will bring the employee in personal contact with the patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers, enabling him, by engaging in a competing business in his own behalf, or for another, to take advantage of such knowledge of or acquaintance with the patrons or customers of his former employer, and thereby gain an unfair advantage, equity will interfere in behalf of the employer and restrain the breach of a negative covenant not to engage in such competing business, either for himself or for another, providing the covenant does not offend against the rule that as to the time during which the restraint is imposed, or as to the territory it embraces, it shall be no greater than is reasonably necessary to secure the protection of the business or good will of the employer."

*Securities Acceptance Corp. v. Brown, supra* at 418-19, 106 N.W.2d at 464 (quoting from Annot., Restrictive Covenant in Employment Contract, 9 A.L.R. 1468 (1920)).

Also, regarding a contract of employment and a covenant against postemployment competition, we have noted:

Regarding a postemployment covenant not to compete, an employer has a legitimate business interest in protection against " 'competition by improper and unfair

methods,' " but an employer is not entitled to enforcement of a restrictive covenant which merely protects the employer from " 'ordinary competition.' " *Diamond Match Div. of Diamond International Corp. v. Bernstein, supra* at 455, 243 N.W.2d at 766. "A restraint on the employee is illegal when its purpose is the prevention of competition, except when the methods of competition to be prevented are methods commonly regarded as improper and unfair." 6A A. Corbin, Corbin on Contracts § 1394 at 100 (1962).

To distinguish between "ordinary competition" and "unfair competition," courts and commentators have frequently focused on an employee's opportunity to appropriate the employer's goodwill by initiating personal contacts with the employer's customers. Where an employee has substantial personal contact with the employer's customers, develops goodwill with such customers, and siphons away the goodwill under circumstances where the goodwill properly belongs to the employer, the employee's resultant competition is unfair, and the employer has a legitimate need for protection against the employee's competition. . . . [A]n employer has a legitimate need to curb or prevent competitive endeavors by a former employee who has acquired confidential information or trade secrets pertaining to the employer's business operations. . . . From the foregoing we glean that an objective of a covenant not to compete is prevention of an employee's competitive use of information or a relationship with a customer or client, which pertains peculiarly to the employer and has been acquired in the course of the employee's employment with the employer. . . .

. . . Ordinarily, an employer has no legitimate business interest in postemployment prevention of an employee's use of some general skill or training acquired while working for the employer, although such on-the-job acquisition of general knowledge, skill, or facility may make the employee an effective competitor for the former employer.

*Boisen v. Petersen Flying Serv.*, 222 Neb. 239, 245-47, 383 N.W.2d 29, 33-34 (1986). Thus, in *Boisen*, we concluded: "A covenant not to compete, as a partial restraint of trade, is available to prevent unfair competition by a former employee but is not available to shield an employer against ordinary competition." 222 Neb. at 248, 383 N.W.2d at 34-35.

In *American Sec. Servs. v. Vodra*, 222 Neb. 480, 487-88, 385 N.W.2d 73, 78-79 (1986), we observed that

> a key for distinguishing "unfair competition" from "ordinary competition" is an employee's appropriation of "good will" properly belonging to the employer.
>
> In reference to an employer-customer relationship, good will is that "value which results from the probability that old customers will continue to trade or deal with the members of an established concern. [Good will] is the probability that old customers will resort to the old place or seek old friends, and the likelihood of new customers being attracted to well advertised and favorably known services . . . ." *Jackson v. Caldwell*, 18 Utah 2d 81, 85, 415 P.2d 667, 670 (1966).
>
> Good will may also be characterized as "the habit of customers to return to the concern with which they have been previously dealing. The more ingrained the habit, the greater the number of such customers, the more valuable is the goodwill." *Meeker v. Stuart*, 188 F. Supp. 272, 275 (D.D.C. 1960).
>
> . . . .
>
> Clientele or customer contact is one of the most important assets, sometimes the stock, of a business. Protection of customer good will against appropriation by an employee is, generally, recognized as an employer's valid interest.

See, also, 6A A. Corbin, Corbin on Contracts § 1394 at 99-100 (1962):

> "[A]fter the promised service has been completed, a restriction on further active services requires special justification. Such a justification is commonly thought to exist if a part of the employee's compensated service consists in the creation of the good will of customers and

clients, a good will that is likely to follow the person of the employee himself."

There are three general questions relative to validity of partial restraints of trade: First, is the restriction reasonable in the sense that it is not injurious to the public? Second, is the restriction reasonable in the sense that it is no greater than is reasonably necessary to protect the employer in some legitimate interest? Third, is the restriction reasonable in the sense that it is not unduly harsh and oppressive on the employee? See, *Boisen v. Petersen Flying Serv., supra*; *Securities Acceptance Corp. v. Brown*, 171 Neb. 406, 106 N.W.2d 456 (1960).

"Reasonableness of a specific restrictive covenant must be assessed upon the facts of a particular case and must be determined on all the circumstances." *American Sec. Servs. v. Vodra, supra* at 489, 385 N.W.2d at 79.

Thus, we come to the question whether the restriction is "reasonable in the sense that it is not unduly harsh and oppressive on the employee." *Securities Acceptance Corp. v. Brown, supra* at 417, 106 N.W.2d at 463.

In determining whether a postemployment covenant not to compete is unduly harsh or oppressive, a court must balance harshness and oppressiveness on the covenantor employee against protection of the covenantee employer's valid business interest. *American Sec. Servs. v. Vodra, supra*. As we expressed in *American Sec. Servs. v. Vodra*:

> In *Philip G. Johnson & Co. v. Salmen*, 211 Neb. 123, 317 N.W.2d 900 (1982), this court recognized a "balancing test" to be applied in determining whether the restraint of a postemployment covenant not to compete is unduly harsh or oppressive and, therefore, unenforceable. The factors or considerations involved in such balancing test, required by *Philip G. Johnson & Co. v. Salmen, supra* at 128, 317 N.W.2d at 904, are "the degree of inequality in bargaining power; the risk of the covenantee losing customers; the extent of respective participation by the parties in securing and retaining customers; the good faith of the covenantee; the existence of sources or general knowledge pertaining to the identity of customers; the nature and extent of the business position held by the

covenantor; the covenantor's training, health, education, and needs of his family; the current conditions of employment; the necessity of the covenantor changing his calling or residence; and the correspondence of the restraint with the need for protecting the legitimate interests of the covenantee."

As required by *Philip G. Johnson & Co. v. Salmen, supra,* harshness and oppressiveness on the covenantor-employee is weighed against protection of a valid business interest of the covenantee-employer. However, in the balancing test applied to a postemployment covenant not to compete, there is no arithmetical computation or formula required in a court's consideration of the factors involved or to be considered. The factors or considerations to be used in that balancing test are not weighted; that is, there is no prescribed method by which more or less weight is assigned to each factor to be considered in the balancing test required by *Philip G. Johnson & Co. v. Salmen, supra.*

222 Neb. at 490-91, 385 N.W.2d at 80.

Squier contends that the covenants not to compete are injurious to the public because enforcement of the covenants would prevent the public from access to Squier as an insurance agent.

In *Dow v. Gotch,* 113 Neb. 60, 64, 201 N.W. 655, 657 (1924), this court stated that a covenant not to compete is against public policy if it has a " 'mischievous tendency, and in some way militate[s] against the public welfare and the rights of the public.' " In *Dow,* the court concluded that a beautician's promise not to compete with her former employer was not injurious to the public, since the area of noncompetition was the city of Grand Island, which "had beauty parlors a plenty, a number of them." *Id.*

In Squier's case, each of the noncompetition covenants involves a very specific category of customers. First, the covenant in the sale agreement relates only to previous customers of the Squier-McCashland Agency, individuals wherever they may be located, but who have been identified on the customer list included in the sale to Chambers-Dobson.

This category of customer exists unrelated to Squier's employment with Chambers-Dobson. Second, the covenant in Squier's employment contract relates only to persons who have been Chambers-Dobson's customers during Squier's employment with Chambers-Dobson, wherever those customers may live. Consequently, in reference to potential insurance customers, the covenants relate not to the public in general, but to very specific and limited groups of potential customers denied to Squier by the covenants. As far as an actual number is concerned, the prohibited customer pool consisted of 20 former customers of the Squier-McCashland Agency and 19 Chambers-Dobson customers. We take note that if the populace of the city of Lincoln and Lancaster County has been correctly counted by the U.S. Bureau of the Census for the 1980 census, Lincoln included 171,932 people, while Lancaster County included 192,884 persons. Although the noncompetition covenants are not restricted to Lincoln and Lancaster County, nonetheless, it is inconceivable that the aggregate number of persons comprising the potential customer pools denied to Squier by the covenants is large enough to justify the conclusion that an appreciable number of the public would be denied access to Squier as their insurance agent. Under the circumstances, the noncompetition covenants do not violate Nebraska public policy.

We now address the two remaining questions, whether the noncompetition covenants were reasonable protection for a legitimate interest of Chambers-Dobson and whether the covenants are unduly harsh and oppressive on Squier.

First, we consider the covenant in the sale agreement for the assets of the Squier-McCashland Agency purchased by Chambers-Dobson. The customer list was specific property, specially considered by the parties and included in the sale with a substantial part of the purchase price allocated for acquisition of the list. It would be more than mild inequity if one sold an item of property, received payment, and, shortly thereafter, were allowed to repossess the property without the purchaser's consent and retain the purchase price paid for the property. Yet, that is exactly what Squier will achieve if he is allowed to pursue an insurance agency which involves the former

Squier-McCashland Agency customers. A noncompetition covenant is a reasonable method to protect the property acquired by Chambers-Dobson. Also, given the acknowledged and accepted "useful life" of the customer list, the temporal restriction is reasonable.

Second, we address the covenant in Squier's employment contract. The information gained by Squier as a result of his employment with Chambers-Dobson is not a trade secret; for example, a secret device, formula, pattern, plan, process, or technique, which have commercial value and are known only to the owner of such items used in the owner's business to obtain an advantage over competitors. See *Cherne Indus., Inc. v. Grounds & Associates*, 278 N.W.2d 81 (Minn. 1979). Since the evidence establishes a basis for the view that an insurance agent has a confidential personal relationship with a customer, the noncompetition covenant was an important aspect of the employment contract. In the course of his employment at Chambers-Dobson, Squier came into possession of special information about insurance customers, both current and prospective, which Squier would not have received if he were not a Chambers-Dobson employee. Much of that information received by Squier involved data pertinent to continuation of a customer's insurance business and, hence, was a part of Chambers-Dobson's goodwill. Squier's postemployment use of that information can be characterized as Squier's siphoning Chambers-Dobson's goodwill, a legitimate property interest of Chambers-Dobson. See *American Sec. Servs. v. Vodra*, 222 Neb. 480, 385 N.W.2d 73 (1986). A noncompetition covenant is a valid means to protect an employer against postemployment unfair competition by an employee. See *Boisen v. Petersen Flying Serv.*, 222 Neb. 239, 383 N.W.2d 29 (1986). Squier's use of the information acquired during his employment at Chambers-Dobson would constitute unfair competition after his termination of employment with Chambers-Dobson. For that reason, injunctive relief is available to protect the goodwill of Chambers-Dobson. Under the circumstances, the 2-year time limit for vitality of the noncompetition covenant is reasonable.

The absence of specified geographic applicability of the

noncompetition covenants presents no problem under the circumstances inasmuch as Squier can conduct an insurance agency in Lincoln or any other location, provided that he does not draw customers from the pools prohibited by the covenants. The covenants' limited applicability to customers and area leaves open to Squier a rather vast market in the insurance business. That and the several other factors bearing on harshness and oppressiveness to an employee, see, *Philip G. Johnson & Co. v. Salmen*, 211 Neb. 123, 317 N.W.2d 900 (1982), and *Boisen v. Petersen Flying Serv., supra*, lead us to the conclusion that the noncompetition covenants are reasonable and are neither harsh nor oppressive to Squier.

We realize that the terms of the injunctions expired during pendency of this appeal. However, a noncompetition covenant expressed in a contract for sale of property or in an employment contract is a matter of public interest and, in Squier's appeal, involved questions which, as the result of this court's docket, would not likely be considered before expiration of the covenants' restrictive temporal duration; hence, we review the questions in Squier's appeal. See *Meyer v. Colin*, 204 Neb. 96, 281 N.W.2d 737 (1979) (mootness does not preclude appellate review of a matter of public interest). See, also, *State ex rel. Bouc v. School Dist. of City of Lincoln*, 211 Neb. 731, 320 N.W.2d 472 (1982); *Braesch v. DePasquale*, 200 Neb. 726, 265 N.W.2d 842 (1978); *State ex rel. Coulter v. McFarland*, 166 Neb. 242, 88 N.W.2d 892 (1958). Moreover, if the covenants were invalid and, therefore, an improper basis for injunctive relief, there might have been a question of damages from an improper injunction. See Neb. Rev. Stat. § 25-1067 (Reissue 1989).

Consequently, after our de novo review of the record, we independently reach the same conclusion reached by the district court, namely, injunctive relief is appropriate under the circumstances. For that reason, we affirm the district court's judgments for injunctive relief.

## CROSS-APPEAL

Chambers-Dobson claims that the district court erred in not awarding an attorney fee in accord with the express

authorization for such fee as a provision in each of the contracts in Squier's case.

In Nebraska, the general rule is that an attorney fee may be recovered only when authorized by statute, or when a recognized and accepted uniform course of procedure allows recovery of an attorney fee. See, *First Nat. Bank v. Schroeder*, 218 Neb. 397, 355 N.W.2d 780 (1984); *Quinn v. Godfather's Investments*, 217 Neb. 441, 348 N.W.2d 893 (1984). We have repeatedly held that a provision in a contract which provides that in the event of litigation involving the contract, the prevailing party shall be entitled to costs, including an attorney fee, is contrary to public policy and void. *First Nat. Bank v. Schroeder, supra*; *Quinn v. Godfather's Investments, supra*; *City of Gering v. Smith Co.*, 215 Neb. 174, 337 N.W.2d 747 (1983).

Apart from the contractual provision regarding an attorney fee, Neb. Rev. Stat. § 25-824(2) (Reissue 1989) permits an attorney fee when a defense is frivolous or made in bad faith. However, under the circumstances, we are unable to conclude that Squier's defense is either frivolous or made in bad faith; hence, no attorney fee is allowable under § 25-824(2).

Therefore, the district court correctly denied Chambers-Dobson's request for an attorney fee. Correspondingly, we are unable to award an attorney fee for the services of Chambers-Dobson's lawyers in the proceedings before this court.

Accordingly, the district court's judgments are affirmed in all respects.

AFFIRMED.