IN RE ESTATE OF A.M. STEPHENSON, DECEASED.
MICHAEL N. MULLIGAN, PERSONAL REPRESENTATIVE OF THE
ESTATE OF HELEN STEPHENSON, DECEASED, APPELLANT, V. M.L.
STEPHENSON ET AL., COPERSONAL REPRESENTATIVES OF THE
ESTATE OF A.M. STEPHENSON, DECEASED, APPELLEES.

503 N.W.2d 540

Filed July 30, 1993.   Nos. S-90-919, S-90-920.

Richard L. Halbert and Michael R. Dunn, of Halbert & Dunn, and Daniel Duffy, of Cassem, Tierney, Adams, Gotch & Douglas, for appellant.

M.J. Bruckner and Paul J. Peter, of Bruckner, O'Gara, Keating, Sievers & Hendry, P.C., and William F. Davis for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

SHANAHAN, J.

Helen Stephenson, the widow of A.M. Stephenson, filed her petition in the county court for Otoe County, requesting

allowances for homestead, exempt property, and spousal support and further requesting that the court, pursuant to Neb. Rev. Stat. § 30-2317 (Reissue 1989), set over to Helen her elective share in the augmented estate of A.M. Stephenson, deceased.

The personal representatives of the A.M. Stephenson estate objected to Helen's requested allowances and an elective share because Helen and A.M. Stephenson had signed an antenuptial agreement which barred Helen's sharing in the A.M. Stephenson estate and waived all claims against the estate. In response to the objection, Helen replied that the antenuptial agreement was "a result of fraud and overreaching."

The county court found that the evidence was "clear and convincing" that the antenuptial agreement was the "result of fraud in the inducement on the part of A.M. Stephenson" because "A.M. Stephenson intentionally withheld from Helen Stephenson information concerning the nature and extent of his assets." Therefore, the court entered judgment for Helen Stephenson and invalidated the antenuptial agreement, thereby entitling Helen to an elective share equal to one-half of the augmented estate of A.M. Stephenson, deceased. The county court also granted Helen Stephenson allowances for spousal support, homestead, and exempt property. Later, the county court ordered that the estate pay fees and costs for the lawyers who represented the personal representatives on their objections.

The county court's judgments were appealed to the district court, which, finding that the evidence was not "clear and convincing" on the issue of A.M. Stephenson's fraud, reversed the county court's judgment on the antenuptial agreement and remanded the cause to the county court with direction "to incorporate the provisions of the antenuptial agreement in the estate proceeding, giving it full force and effect," that is, the antenuptial agreement barred Helen Stephenson's claims against, and an elective share of, the estate of A.M. Stephenson, deceased. However, the district court affirmed the county court's judgment for fees and costs.

Helen Stephenson appealed from both judgments of the district court, but died pending her appeals consolidated for

disposition by this court. Helen Stephenson's appeals have been revived in the name of Michael N. Mulligan, personal representative of the estate of Helen Stephenson, deceased. See Neb. Rev. Stat. § 25-1401 et seq. (Reissue 1989) (revivor of action).

## REVIVOR

The personal representatives of the A.M. Stephenson estate contend that since Helen has died during pendency of these appeals, her claims for allowances and an elective share as a surviving spouse have abated; therefore, revivor is unavailable.

Neb. Rev. Stat. § 30-2315 (Reissue 1989) of the Nebraska Probate Code states: "The right of election of the surviving spouse may be exercised only during his or her lifetime by him or her." According to § 30-2317: "The surviving spouse may elect to take his or her elective share in the augmented estate by filing in the court and mailing or delivering to the personal representative, if any, a petition for the elective share . . . ."

Neb. Rev. Stat. § 30-2324 (Reissue 1989) of the Nebraska Probate Code authorizes an allowance for support of a surviving spouse during administration of an estate. Further, § 30-2324 provides in part: "The death of any person entitled to family allowance, other than the surviving spouse, terminates his [or her] right to allowances not yet paid." Also, in part Neb. Rev. Stat. § 30-2325 (Reissue 1989) provides:

The homestead allowance, the exempt property, and the family allowance as finally determined by the personal representative or by the court, shall vest in the surviving spouse as of the date of decedent's death, as a vested indefeasible right of property, shall survive as an asset of the surviving spouse's estate if unpaid on the date of death of such surviving spouse, and shall not terminate upon the death or remarriage of the surviving spouse.

The appellee personal representatives point to *In re Estate of Samson*, 142 Neb. 556, 7 N.W.2d 60 (1942), and *Jacobson v. Nemesio*, 204 Neb. 180, 281 N.W.2d 552 (1979), as support for their position that Helen Stephenson's claims for allowance and an elective share are abated by her death. In *In re Estate of Samson*, which was decided before the current Nebraska

Probate Code became effective on January 1, 1977, see Neb. Rev. Stat. § 30-2901 (Reissue 1989), this court held that a widow's claim for spousal allowance for her deceased husband's estate was based on a personal right that abated when the widow died during pendency of the widow's appeal from an adverse judgment on her claim for the allowance. In *Jacobson*, this court, considering whether a surviving spouse's claim for support survived the claimant's death, stated that allowances for homestead, exempt property, and spousal support

> are all provided by statute and are personal in nature. We have found no statute, nor are we cited to any statutory provision, declaring that these rights, personal in nature, survive the death of the surviving spouse. It is fundamental that when a party to a pending suit dies and the right is personal in nature, the right dies with the person. The personal representatives of a deceased party to a suit cannot prosecute or defend a suit after his death unless the cause of action on which the suit was brought is one that survives by law.

204 Neb. at 183, 281 N.W.2d at 554. However, we note the existence of §§ 30-2324 and 30-2325 in the Nebraska Probate Code as previously mentioned.

The plain language of §§ 30-2315 and 30-2317, when read conjunctively, states that a surviving spouse elects to take a share in the augmented estate when a petition for the elective share is filed in the county court that has probate jurisdiction and is served on the estate's personal representative, if any. When a surviving spouse has petitioned for an elective share, the right to pursue an elective share is no longer a surviving spouse's potential personal right subject to abatement, but has become a right vested in the surviving spouse. Therefore, if a surviving spouse dies after filing a petition for an elective share pursuant to §§ 30-2315 and 30-2317, the proceeding to enforce the spouse's election as a vested right may be revived by the personal representative of the estate of the spouse who has made the election but who has died before distribution of property pursuant to the elective share.

Helen Stephenson timely elected to take her share of the augmented estate of A.M. Stephenson, deceased; hence, her

election survives her death and may be pursued by the personal representative of her estate. Also, the clear language of §§ 30-2324 and 30-2325 directs that a right to allowances for homestead, exempt property, and unpaid spousal support survives the claimant's death to the extent of unpaid support. Therefore, Helen Stephenson's right to pursue her elective share in the augmented estate of A.M. Stephenson, deceased, and her right to allowances were not terminated by the death of Helen Stephenson, but survived her death as an asset of her estate. Consequently, the present appeals are properly revived by the personal representative of the estate of Helen Stephenson, deceased.

## ANTENUPTIAL AGREEMENTS

*Generally.*

In Nebraska, an antenuptial agreement is statutorily authorized by the Nebraska Probate Code, specifically, Neb. Rev. Stat. § 30-2316 (Reissue 1989), which states:

> The right of election of a surviving spouse and the rights of the surviving spouse to homestead allowance, exempt property and family allowance, or any of them, may be waived, wholly or partially, before or after marriage, by a written contract, agreement or waiver signed by the party waiving after fair disclosure. . . .

"An antenuptial agreement is a contract entered into between a man and a woman in contemplation, and in consideration, of their future marriage whereby the property rights and economic interests of either the prospective wife or husband, or both, are determined and set forth . . . ." *Gross v. Gross*, 11 Ohio St. 3d 99, 102, 464 N.E.2d 500, 504 (1984). Accord, *Russell v. Walz*, 458 N.E.2d 1172 (Ind. App. 1984); *Friedlander v. Friedlander*, 80 Wash. 2d 293, 494 P.2d 208 (1972). Regarding antenuptial agreements, this court stated in *In re Estate of Enyart*, 100 Neb. 337, 343, 160 N.W. 120, 122 (1916):

> Such instruments frequently tend to peace and happiness by settling questions concerning rights of property which, especially in the case of marriage of people in later life having children of a former marriage, often furnish

grounds of irritation and friction which may defeat the very purpose of the union.

Accord *Wulf v. Wulf*, 129 Neb. 158, 261 N.W. 159 (1935). In *In re Estate of Peterson*, 221 Neb. 792, 381 N.W.2d 109 (1986), this court held that an antenuptial agreement which was entered into before January 1, 1977, the effective date of § 30-2316, is governed by the statute in effect at the date of a deceased spouse's death. See § 30-2901 (effective date of the Nebraska Probate Code is January 1, 1977).

*Antenuptial Agreements as Contracts.*

As a contract, an antenuptial agreement is governed by the same principles that are applicable to other contracts, but is subject to the particular statutory requirement that an antenuptial agreement must be based on fair disclosure. See *Dorshorst v. Dorshorst*, 174 Neb. 886, 120 N.W.2d 32 (1963) (an antenuptial agreement, unrecognized at common law, must comply with the formalities prescribed by the statute authorizing antenuptial agreements; hence, compliance with statutory formalities is essential to the existence of an antenuptial agreement). See, also, *Simeone v. Simeone*, 525 Pa. 392, 581 A.2d 162 (1990) (antenuptial agreements are enforceable as any other contract and are examined under the same criteria applicable to other types of contracts); *Gant v. Gant*, 174 W. Va. 740, 329 S.E.2d 106 (1985) (general contract law governs antenuptial agreements); *McHugh v. McHugh*, 181 Conn. 482, 436 A.2d 8 (1980) (antenuptial agreement is a type of contract and must comply with ordinary principles of contract law).

*Burden of Proof re: Invalidity.*

A party asserting the invalidity of an antenuptial agreement has the burden of proving invalidity. See *In re Estate of Peterson*, 221 Neb. 792, 381 N.W.2d 109 (1986). See, also, *Gant v. Gant, supra* (burden of demonstrating invalidity of antenuptial agreement is on the party asserting the agreement's invalidity); *In re Estate of Lopata*, 641 P.2d 952 (Colo. 1982) (a party contesting the validity of an antenuptial agreement has burden of proving invalidity); *In re Estate of Kester*, 486 Pa. 349, 405 A.2d 1244 (1979) (burden of proof is on one seeking to

invalidate an antenuptial agreement). Thus, the rule concerning the burden of proof to invalidate an antenuptial agreement favors the validity of antenuptial agreements and is, therefore, consistent with the notion that antenuptial agreements are useful instruments which can be helpful in ordering the financial affairs of spouses, particularly spouses who seek to protect the financial well-being of a child or children born of a prior marriage.

In *Strickland v. Omaha Nat. Bank*, 181 Neb. 478, 488, 149 N.W.2d 344, 352 (1967), this court stated:

> Ordinarily the burden of proof as to the invalidity of an antenuptial contract is on the party alleging it; but if the contract is unjust and unreasonable to the prospective wife on its face, a presumption of fraud arises, the burden shifts, and it is incumbent on the husband to prove the validity of the contract.

Consequently, we now expressly disapprove and reject the statement in *Strickland v. Omaha Nat. Bank, supra*: "[I]f the contract is unjust and unreasonable to the prospective wife on its face, a presumption of fraud arises, the burden shifts, and it is incumbent on the husband to prove the validity of the contract."

### "FAIR DISCLOSURE"

In accordance with § 30-2316 regarding an antenuptial agreement, "after fair disclosure" one may sign a written contract or agreement waiving the right to an elective share of a prospective spouse's estate and the right to allowances for homestead, exempt property, and spousal support.

In *In re Estate of Hill*, 214 Neb. 702, 706-07, 335 N.W.2d 750, 753 (1983), this court characterized "fair disclosure" used in § 30-2316:

> "Fair disclosure is not synonymous with detailed disclosure such as a financial statement of net worth and income. The mere fact that detailed disclosure was not made will not necessarily be sufficient to set aside an otherwise properly executed agreement. Where the agreement was freely executed, the fact that one party did not disclose in detail to the other party the nature, extent,

and value of his or her property will not alone invalidate the agreement or raise a presumption of fraudulent concealment. [Citations omitted.] Fair disclosure contemplates that each spouse should be given information, of a general and approximate nature, concerning the net worth of the other. Each party has a duty to consider and evaluate the information received before signing an agreement since they are not assumed to have lost their judgmental faculties because of their pending marriage."

(Quoting *In re Estate of Lopata, supra.*) Accord *In re Estate of Peterson, supra.*

Notwithstanding the phrase "fair disclosure" in § 30-2316, this court has held that the basic issue for invalidation of an antenuptial agreement "is fraud or overreaching and not the absence of disclosure." *Moss v. Stueven,* 200 Neb. 215, 217, 263 N.W.2d 98, 100 (1978). Accord, *Grassman v. Jensen,* 183 Neb. 147, 158 N.W.2d 673 (1968) (fraud in the inducement is sufficient ground for avoidance of antenuptial agreement); *Strickland v. Omaha Nat. Bank, supra* (basic issue is fraud or overreaching, not the absence of disclosure).

Therefore, as used in § 30-2316 concerning an antenuptial agreement, "fair disclosure" means that before signing an antenuptial agreement, each party must disclose to the other the facts that exist at the time of the agreement and which, in the absence of the antenuptial agreement, affect or determine the prospective intestate share of a surviving spouse in the disclosing party's estate or which otherwise affect or determine distribution of property at the disclosing party's death. Thus, § 30-2316 imposes a statutory duty that the parties to an antenuptial agreement make fair disclosure before signing the antenuptial agreement. Cf. *Strickland v. Omaha Nat. Bank, supra* (parties to an antenuptial agreement have a relationship of mutual trust and confidence).

## FRAUD BY CONCEALMENT

*Fraud by Concealment.*

"[W]here one has a duty to speak, but deliberately remains silent, his silence is equivalent to a false representation." *State*

*ex rel. NSBA v. Douglas*, 227 Neb. 1, 25, 416 N.W.2d 515, 530 (1987).

Accordingly, to prove fraudulent concealment, a plaintiff must show that (1) the defendant had a duty to disclose a material fact; (2) the defendant, with knowledge of the material fact, concealed the fact; (3) the material fact was not within the plaintiff's reasonably diligent attention, observation, and judgment; (4) the defendant concealed the fact with the intention that the plaintiff act in response to the concealment or suppression; (5) the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as the result of the concealment, acted or withheld action; and (6) the plaintiff was damaged by the plaintiff's action or inaction in response to the concealment. See, *Kracl v. Loseke*, 236 Neb. 290, 461 N.W.2d 67 (1990); *Security Inv. Co. v. State*, 231 Neb. 536, 437 N.W.2d 439 (1989); *Nelson v. Cheney*, 224 Neb. 756, 401 N.W.2d 472 (1987).

> *Conceal* means "To hide, secrete, or withhold from the knowledge of others. To withdraw from observation; to withhold from utterance or declaration; to cover or keep from sight. To hide or withdraw from observation, cover or keep from sight, or prevent discovery of." Black's Law Dictionary 261 (5th ed. 1979).

*Christopher v. Evans*, 219 Neb. 51, 55, 361 N.W.2d 193, 196 (1985). Accord, *Balfany v. Balfany*, 239 Neb. 391, 476 N.W.2d 681 (1991); *Kracl v. Loseke, supra*.

*Burden of Proof re: Fraud.*

As a general principle of proof, one alleging fraud must prove fraud. See *Erftmier v. Eickhoff*, 210 Neb. 726, 316 N.W.2d 754 (1982).

## HELEN STEPHENSON'S CLAIM

To avoid the consequence of her antenuptial agreement with A.M. Stephenson, Helen Stephenson asserts that the agreement resulted from A.M. Stephenson's fraudulent concealment which induced her to sign the agreement. Therefore, Helen Stephenson requested, in essence, that the county court rescind the antenuptial agreement, setting aside the agreement as a bar to Helen's taking an elective share of, and receiving allowances

from, the estate of A.M. Stephenson, deceased.

*County Court Jurisdiction.*

Concerning a county court's jurisdiction, Neb. Rev. Stat. § 30-2211(b) (Reissue 1989) states: "The court has full power to make orders, judgments and decrees and take all other action necessary and proper to administer justice in the matters which come before it."

In exercising probate jurisdiction, a court may use equity power and principles to dispose of a matter within the court's probate jurisdiction. See, *In re Estate of Detlefs,* 227 Neb. 531, 418 N.W.2d 571 (1988); *In re Estate of Steppuhn,* 221 Neb. 329, 377 N.W.2d 83 (1985); *In re Estate of Layton,* 207 Neb. 646, 300 N.W.2d 802 (1981).

"An action to rescind a written instrument is an equity action." *Kracl v. Loseke,* 236 Neb. at 292, 461 N.W.2d at 69. Accord, *Fee v. Fee,* 223 Neb. 128, 388 N.W.2d 122 (1986); *Christopher v. Evans, supra.*

Because rescission of the Stephenson antenuptial agreement was an equitable remedy, the county court, exercising equity power within the court's probate jurisdiction, applied equity principles in determining whether the agreement was fraudulent and, therefore, subject to rescission in the sense that the antenuptial agreement would be set aside as a bar to Helen Stephenson's share of the estate of A.M. Stephenson, deceased.

*Proof of Fraud.*

"Fraud may be proved by circumstantial evidence." *Kracl v. Loseke,* 236 Neb. at 296, 461 N.W.2d at 72. Accord, *J. L. Brock Bldrs., Inc. v. Dahlbeck,* 223 Neb. 493, 391 N.W.2d 110 (1986); *Alliance Nat. Bank v. State Surety Co.,* 223 Neb. 403, 390 N.W.2d 487 (1986).

"In an equity case, fraud must be proven by clear and convincing evidence." *Kracl v. Loseke,* 236 Neb. at 296, 461 N.W.2d at 72.

"[C]lear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved." *Castellano v. Bitkower,* 216 Neb. 806, 812, 346 N.W.2d 249, 253 (1984). Accord, *In re Interest of C.K., L.K., and G.K.,* 240

Neb. 700, 484 N.W.2d 68 (1992); *Newton v. Brown*, 222 Neb. 605, 386 N.W.2d 424 (1986); *Gifford-Hill & Co. v. Stoller*, 221 Neb. 757, 380 N.W.2d 625 (1986).

## STANDARD OF REVIEW

According to Neb. Rev. Stat. § 25-2733 (Reissue 1989), which is applicable to appeals under the Nebraska Probate Code, see Neb. Rev. Stat. §§ 30-2217 and 30-1601 (Reissue 1989), the district court's standard of review for a judgment within a county court's probate jurisdiction is an examination "for error appearing on the record made in the county court . . . ."

"In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court. See, Neb. Rev. Stat. § 25-1911 (Cum. Supp. 1992) . . . ." *In re Estate of Watkins, ante* p. 583, 587, 501 N.W.2d 292, 295 (1993). However, as noted, there is an equity question involved in the probate proceedings for the estate of A.M. Stephenson, deceased, namely, whether the antenuptial agreement is a product of fraud by A.M. Stephenson's concealment so that the antenuptial agreement may be set aside as a bar to Helen Stephenson's share of the estate of A.M. Stephenson, deceased, and allowances from the estate.

> In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where credible evidence is in conflict on a material issue of fact, an appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

*Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 750, 472 N.W.2d 391, 395 (1991). Accord, *Ehlers v. Perry*, 242 Neb. 208, 494 N.W.2d 325 (1993); *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 458 N.W.2d 443 (1990); *American Sec. Servs. v. Vodra*, 222 Neb. 480, 385 N.W.2d 73 (1986).

Therefore, both the district court and this court, as appellate courts reviewing an equity question determined in probate

proceedings before a county court, must conduct a de novo review of the record and reach factual conclusions independent of those reached by the county court.

## BACKGROUND
*Before the Agreement.*

In 1956, Helen Stephenson, then Helen Mulligan, became acquainted with A.M. Stephenson and started working as a clerk in a Nebraska City hotel owned by him. Helen and her children moved to Columbus, Nebraska, in 1960, where she remained until 1968, when she returned to Nebraska City and renewed her acquaintance with A.M. Stephenson, whose wife had died a year earlier.

*Meeting for the Antenuptial Agreement.*

On the morning of February 27, 1969, A.M. Stephenson telephoned Helen and said "get your bag packed" because he and she were going to "catch a plane to Las Vegas and be married." Stephenson was 65 years of age, and Helen was 58. However, before departing for the airport, A.M. Stephenson and Helen met at the office of Otto H. Wellensiek, A.M. Stephenson's longtime lawyer. Helen was nervous, and therefore, Wellensiek read a "prenuptial agreement" for Helen, who had no lawyer and had not seen the agreement before her appearance at Wellensiek's office. The agreement contained no information concerning A.M. Stephenson's property. No financial statement for A.M. Stephenson or list of his property was given to Helen. Although Helen believed that A.M. Stephenson had substantial property interest, she lacked knowledge concerning his specific assets.

Wellensiek was A.M. Stephenson's lawyer in various business and personal transactions and had handled the legal work for A.M. Stephenson's purchases and sales of property. Also, as A.M. Stephenson's lawyer who had prepared the antenuptial agreement, Wellensiek recognized the importance of a disclosure of property in conjunction with an antenuptial agreement and, as A.M. Stephenson's lawyer, undertook "every effort to make a full disclosure" to Helen. In making this disclosure, Wellensiek mentioned several items of property owned by A.M. Stephenson, including a liquor store in

Nebraska City, the Grand Hotel Company, the Stephenson Hotel and Stephenson Motel in Falls City, Nebraska, as well as a hotel and motel in Mexico, Missouri. Wellensiek further mentioned that A.M. Stephenson had substantial funds in the form of cash and certificates of deposit and said that A.M. Stephenson's assets were valued in "excess of a million dollars." A.M. Stephenson "concurred" with Wellensiek's description of the Stephenson property.

*The Antenuptial Agreement and Marriage.*

After Wellensiek's property description, Helen signed the antenuptial agreement before a notary public in Wellensiek's office. The agreement stated, among other things, that

> upon the death of either [A.M. Stephenson or Helen], the survivor will not have, and will not assert any claim, interest, estate, or title under the laws of any State, because of such survivorship in or to the property, real, person, or mixed, of which said deceased party may die seized or possessed . . . and such survivor hereby relinquishes to the heirs, devisees, administrators, executors, and assigns of such deceased party, any and all of his or her claim, distributive share, interest, estate, or title that he or she would be entitled to as the surviving husband or wife respectively . . . .

After signing the antenuptial agreement, A.M. Stephenson and Helen flew to Las Vegas, where they married on March 1, 1969.

*Estate of A.M. Stephenson, Deceased.*

A.M. Stephenson died testate on January 29, 1987. Under his will filed with the county court on February 13, 1987, and later admitted to probate, A.M. Stephenson acknowledged that he left two sons and a daughter surviving him and, after devising a trust estate of $35,000 for the benefit of Helen Stephenson, devised a life estate to Helen concerning the family residence, made several bequests to his children and grandchildren, devised the "Stephenson Toddy Shop," a liquor store, to his grandsons, bequeathed to his children and grandchildren all his capital shares in the Grand Hotel Company, and devised the residue of his estate to his son and

grandsons.

The inventory filed in the A.M. Stephenson estate reflected assets valued at $1.1 million, that is, the following assets and values: real estate—$154,400; securities—$274,154; notes and cash—$176,800; insurance—$2,800; property owned jointly with a person other than Helen Stephenson—$165,000; miscellaneous personal property—$63,574; and gifts within 3 years before A.M. Stephenson's death—$276,000.

At the trial concerning Helen's petition for an elective share and allowances and the personal representatives' objection based on the antenuptial agreement, Helen Stephenson, when asked whether A.M. Stephenson or his lawyer, Wellensiek, had told her about all of A.M. Stephenson's property, replied: "I just don't remember because all I wanted to do was get that paper signed and get out and get my bag packed." Further, on cross-examination of Helen Stephenson, questions were asked and answered as follows:

Q- Isn't it true, Mrs. Stephenson, that at the time you signed the agreement, you didn't care whether [A.M. Stephenson] had any other property because all you wanted was to be taken care of?

A- That's right.

Q- You had kind of a rough life up until that point in time —

A- I did.

Q- Your first husband was not able to support you very well?

A- That's right.

Q- And all you were really interested in was in being taken care of?

A- That's right.

Q- And that is — And that came down to having a home and some security?

A- That's right.

. . . .

Q- And isn't it true, Mrs. Stephenson, that you don't know what it was that Mr. Stephenson had, that he did not disclose at the time that you entered into the [antenuptial agreement], because you were not interested, isn't that

true?

A- Yes, it's true.

. . . .

Q- So you weren't interested in what he had that he may not have disclosed at the time of the execution of the prenuptial agreement back in 1969, isn't that true?

A- I didn't go into it —

Q- But the fact of the matter is, that at the time of the execution of that agreement you were not .interested because what you wanted was a husband and security?

A- That's right.

The county court found that the evidence clearly and convincingly established A.M. Stephenson's fraud in concealing information concerning his assets when he and Helen signed their antenuptial agreement. Therefore, the county court found that A.M. Stephenson's fraud by concealment invalidated the antenuptial agreement and determined that Helen Stephenson, in the absence of the antenuptial agreement which was invalidated, was entitled to a $412,516 share of the estate of A.M. Stephenson, deceased. The court also awarded Helen allowances for homestead, exempt property, and spousal support for 1 year. Attorney fees were awarded to the personal representatives' lawyers.

In appeals to the district court, the county court's judgment for the attorney fees was affirmed, but the district court concluded that evidence of A.M. Stephenson's fraud was not "clear and convincing" and, consequently, reversed the county court's judgment concerning invalidation of the antenuptial agreement and remanded the cause to the county court with the direction previously mentioned.

## ASSIGNMENTS OF ERROR

Helen Stephenson, through the personal representative of the estate of Helen Stephenson, deceased, contends that (1) the evidence prevents the district court's judgment reversing the county court's judgment for Helen Stephenson and remanding the cause to the county court; (2) the county court erred in its determination concerning the value of a liquor store, the Stephenson Toddy Shop, as an asset of the estate of A.M.

Stephenson, deceased; and (3) the county court abused its discretion in awarding attorney fees for the personal representatives' lawyers.

## DE NOVO REVIEW

Because this is an equity case involving alleged fraud by concealment, we have conducted our de novo review of the record as required in an appeal from a judgment in an equity action. See *Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 472 N.W.2d 391 (1991).

Even if we assume for the time being that A.M. Stephenson intentionally withheld material information necessary for a fair disclosure under § 30-2316, a de novo review brings our focus to Helen Stephenson's testimony, which may be summarized as follows: Before and at the time of signing the antenuptial agreement, Helen Stephenson's primary reason for signing the agreement was her prospective marriage to A.M. Stephenson and her "being taken care of" with a husband, home, and security. Therefore, according to Helen Stephenson, she was not interested in A.M. Stephenson's property, his financial condition, or his assets as information inducing her to sign the antenuptial agreement. In that posture, the evidence is neither clear nor convincing that Helen Stephenson relied on any information about A.M. Stephenson's financial condition or assets as an inducement to the antenuptial agreement. In our view, all the evidence points to the fact that Helen Stephenson would have signed, and actually did sign, the antenuptial agreement regardless of any disclosure or absence of a disclosure by A.M. Stephenson concerning facts and information which potentially and eventually affected Helen Stephenson's elective share in A.M. Stephenson's estate in the absence of an antenuptial agreement. However, we neither state nor imply that Helen Stephenson had a duty to inquire about A.M. Stephenson's property. A.M. Stephenson had the duty to make a fair disclosure in reference to the antenuptial agreement. Nonetheless, because Helen Stephenson failed to establish her detrimental reliance on the disclosure, she failed to prove her claim based on A.M. Stephenson's fraud by concealment and, therefore, was not entitled to equitable relief

in the form of a rescission, that is, invalidation of the antenuptial agreement. See *Kracl v. Loseke*, 236 Neb. 290, 461 N.W.2d 67 (1990).

Thus, as a result of our factual findings independent of those made by the county court as the trial court for the Stephenson case, we conclude that Helen Stephenson failed to meet her burden of proof, by clear and convincing evidence, that A.M. Stephenson concealed material information required to be disclosed for a valid antenuptial agreement and that such concealment induced Helen Stephenson to sign the antenuptial agreement. Therefore, our finding coincides with the fundamental finding by the district court; hence, we affirm the district court's judgment reversing the county court's judgment concerning the antenuptial agreement and remanding this cause to the county court with direction that the antenuptial agreement, as a matter of law, bars Helen Stephenson's elective share in the estate of A.M. Stephenson, deceased, and bars allowances to Helen Stephenson for homestead, exempt property, and spousal support.

Since we have determined that the antenuptial agreement has not been invalidated and, therefore, that Helen Stephenson is not entitled to an elective share of the estate of A.M. Stephenson, deceased, or allowances from the estate, we need not consider Helen Stephenson's assignments of error concerning the valuation of the Stephenson Toddy Shop and the attorney fee awarded to the personal representatives' lawyers.

## CONCLUSION

After our de novo review, we affirm the district court's judgments. Accordingly, as the result of the district court's judgment concerning the antenuptial agreement, this cause is remanded to the county court for further proceedings with the direction that the antenuptial agreement bars Helen Stephenson's elective share of the estate of A.M. Stephenson, deceased, and, further, bars allowances to Helen Stephenson from the estate of A.M. Stephenson, deceased.

AFFIRMED AND REMANDED WITH DIRECTION.