# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CABELA'S LLC, a Delaware limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2018-0607-TMR |
| RYAN WELLMAN, an individual, TRENT SANTERO, an individual, MIKE RIDDLE, an individual, JEREMY NESBITT, an individual, and NEXGEN OUTFITTERS, LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  October 17, 2018
Date Decided:  October 26, 2018

Kevin M. Coen and Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Sean M. Berkowitz, Matthew W. Walch, and Reuben J. Stob, LATHAM & WATKINS LLP, Chicago, Illinois; *Attorneys for Plaintiff.*

Henry E. Gallagher, Timothy M. Holly, Mary I. Akhimien, and Shaun Michael Kelly, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; Patrick J. Barrett and Rhianna A. Kittrell, FRASER STRYKER PC LLO, Omaha, Nebraska; *Attorneys for Defendants.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This memorandum opinion addresses an employer's Motion for a Preliminary Injunction. The employer requests that this Court enjoin four former employees from violating noncompete, nonsolicitation, and confidentiality provisions contained in agreements they each executed during their employment. The employer also requests that this Court enjoin the former employees and the limited liability company they founded from tortiously interfering with agreements held by any other defendant or any third party. In this opinion, I grant a preliminary injunction enforcing the parties' contractual confidentiality and nonsolicitation provisions.

## I.    BACKGROUND

Plaintiff Cabela's LLC ("Cabela's") is "the World's Foremost Outfitter of hunting, fishing, and outdoor gear."[1]  Until its 2017 merger with Bass Pro Group, LLC ("Bass Pro"), Cabela's had its headquarters in Sidney, Nebraska, "a small rural community,"[2] and it employed nearly one third of the town's residents.[3]  Currently, Cabela's maintains an office in Sidney and is the town's single largest employer.[4]

---

[1]    *Our History*, Cabela's, https://www.cabelas.com (last visited October 22, 2018); *accord* Cumings Aff. Ex. 11, at 8.

[2]    Akhimien Aff. Ex. 63C, at 2.

[3]    *Id.* Ex. 61 ¶¶ 4-5.

[4]    Compl. ¶ 4.

1

Four of the defendants are former employees of Cabela's (the "Individual Defendants"), and each had worked for Cabela's for over a decade.[5] Ryan Wellman worked as the Director of Hunting at Cabela's.[6] His responsibilities included product sourcing, inventory management, vendor negotiations, and departmental budgeting.[7] Mike Riddle and Trent Santero had similar responsibilities in their roles at Cabela's. Riddle worked as the Archery Category Manager for Cabela's,[8] and Santero was the Camping Category Manager.[9] They both selected products, negotiated costs, interacted with vendors, managed inventories, and set retail prices.[10] Jeremy Nesbitt worked as the Senior Director of Planning and Inventory.[11] In this role, he gathered Company data to make inventory planning decisions, and he generated sales data and future projections.[12]

---

[5]     *Id.* ¶¶ 21-24.

[6]     Cumings Aff. Ex. 1, at 21.

[7]     *Id.* Ex. 2, at 1.

[8]     *Id.* Ex. 5, at 11.

[9]     *Id.* Ex. 51, at 12.

[10]    *Id.* Ex. 3, at 1; *id.* Ex 4, at 15; *id.* Ex 5, at 12-13, 18.

[11]    Compl. ¶ 24; Cumings Aff. Ex. 6, at 9, 18.

[12]    Cumings Aff. Ex. 6, at 9-10, 14-15, 43.

## A.    The Individual Defendants' Various Agreements with Cabela's

Cabela's offered equity benefits to key employees holding senior roles, including the Individual Defendants.[13]  To receive Company stock, each employee was required to sign a Proprietary Matters Agreement (the "PMA") and a Restricted Stock Unit Agreement (the "RSUA").[14]  Each year that an employee received a grant of stock, the employee electronically signed a new PMA and RSUA.[15]

By signing the PMA, the employee agreed not to disclose the Company's "Confidential Information."[16]  The PMA also included provisions restricting the employee's conduct after leaving Cabela's, whether through voluntary or involuntary termination.  In the Nonsolicitation of Customers provision, the employee agreed that for a period of eighteen months after leaving Cabela's, the

---

[13]    Compl. ¶ 26.

[14]    *See id.*; Cumings Aff. Exs. 17-20.

[15]    Cumings Aff. Ex. 10, at 30.

[16]    *Id.* Ex. 17 § 1(a) ("Confidential Information" includes "information about [the] Company's products and services, markets, customers and prospective customers, the buying patterns and needs of customers and prospective customers, purchasing histories with vendors and suppliers, contact information for customers, prospective customers, vendors and suppliers, miscellaneous business relationships, investment products, pricing, quoting, costing systems, billing and collection procedures, proprietary software and the source code thereof, financial and accounting data, data processing and communications, technical data, marketing concepts and strategies, business plans, mergers and acquisitions, research and development of new or improved products and services, and general know-how regarding the business of [the] Company and its products and services.").

3

employee would not solicit Cabela's customers with whom the employee had personal contact and did business during the eighteen months prior to leaving Cabela's.[17] In the Nonsolicitation of Vendors provision, the employee agreed that for a period of eighteen months after leaving Cabela's, the employee would not solicit vendors with whom the employee had personal contact and did business during the eighteen months prior to leaving Cabela's.[18] In the Nonsolicitation of Employees provision, the employee agreed that for a period of eighteen months after leaving Cabela's, the employee would not solicit any Company employees if the employee had personal contact with or received confidential information about the Company employee.[19] In the Noncompetition provision, the employee agreed to not perform services for a competitor that are similar to the employee's work for Cabela's for a period of eighteen months after leaving Cabela's.[20] "Competitor" includes any "multi-state, multi-province, and/or multi-channel retailer [in the United States or Canada] engaged in the sale of products and/or services associated

---

[17]   *Id.* § 4.

[18]   *Id.* § 5.

[19]   *Id.* § 6.

[20]   *Id.* § 7.

4

with hunting, fishing, or camping."[21]  The Individual Defendants each entered into a PMA in March or April 2016.[22]

In February 2016, Wellman and Nesbitt also each entered into a Key Employee Change of Control Severance Agreement (the "CIC Agreement").[23]  The purpose of the CIC Agreements was to retain certain high-level employees during the merger with Bass Pro.[24]  In the CIC Agreements, Wellman and Nesbitt again agreed to not disclose the Company's confidential information.[25]  But the CIC Agreements terminated the noncompetition and nonsolicitation provisions in other agreements, effective as of the date Wellman's and Nesbitt's employment with Cabela's ended.[26]  These agreements provided the terms of Wellman's and Nesbitt's severance packages.[27]

---

[21]     *Id.*

[22]     Cumings Aff. Exs. 17-20.

[23]     *Id.* Exs. 24, 25.

[24]     *Id.* Ex. 10, at 10.

[25]     *Id.* Ex. 24 § 6(a)(ii); *id.* Ex. 25 § 6(a)(ii).

[26]     *Id.* Ex. 24 § 2(e); *id.* Ex. 25 § 2(e).

[27]     *Id.* Ex. 24 § 2, *id.* Ex. 25 § 2.

In March 2017, each of the Individual Defendants executed a cash incentive agreement with Cabela's ("Cash Incentive Agreement").[28] In light of the upcoming merger with Bass Pro, Cabela's could no longer grant stock to its employees and, instead, issued cash-based incentive awards.[29] Unlike the PMAs, the Cash Incentive Agreements failed to include any confidentiality, nonsolicitation, or noncompetition provisions.[30]

## B.    The Individual Defendants Leave Cabela's

Cabela's terminated Wellman's employment in February 2018.[31] He accepted the severance package pursuant to the terms of his CIC Agreement.[32] Nesbitt left Cabela's in February 2018.[33] Similarly, he accepted the severance package pursuant to the terms of his CIC Agreement.[34]

---

[28]    Akhimien Aff. Exs. 63A, 64A, 65A, 66A.

[29]    Cumings Aff. Ex. 13, at 60-61; *see also id.* Ex. 10, at 39; Akhimien Aff. Exs. 63A, 64A, 65A, 66A.

[30]    *See, e.g.*, Akhimien Aff. Ex. 63A.

[31]    Cumings Aff. Ex. 10, at 63.

[32]    *See id.* Ex. 24.

[33]    Compl. ¶ 37.

[34]    *See* Cumings Aff. Ex. 25.

6

In February 2018, Cabela's terminated Riddle's employment.[35] Cabela's provided Riddle with a severance package, and as a condition of receiving that severance package, Riddle executed a General Release Agreement and Covenant Not to Sue (the "Riddle Separation Agreement") on February 22, 2018.[36] The Riddle Separation Agreement explicitly does not "affect, modify, or nullify any prior agreement" Riddle entered into with Cabela's "regarding confidentiality, trade secrets, intellectual property, or unfair competition."[37]

Santero ended his employment with Cabela's in March 2018.[38] Cabela's provided Santero with a severance package, and as a condition of receiving that severance package, Santero executed a Confidential Severance Agreement and General Release (the "Santero Separation Agreement") on March 13, 2018.[39] The Santero Separation Agreement explicitly supersedes all prior agreements between Santero and Cabela's "with regard to the subject matter" of the Santero Separation Agreement.[40] The agreement, however, does not "affect, modify, or nullify any

---

[35]    *Id.* Ex. 10, at 41-42.

[36]    *Id.* Ex. 22.

[37]    *Id.* § 14.

[38]    Cumings Aff. Ex. 10, at 41-42, 49.

[39]    *Id.* Ex. 26.

[40]    *Id.* § 17.

7

agreement" Santero entered into with Cabela's that obligates Santero "to protect Cabela's confidential information and/or to refrain from soliciting Cabela's employees or customers after [Santero]'s employment is terminated."[41] The Santero Separation Agreement is silent as to soliciting Cabela's vendors and as to noncompete provisions in other agreements.[42]

## C. The Individual Defendants Lay the Groundwork for NexGen

In December 2017 and January 2018, before the Individual Defendants left Cabela's, they started making preparations for their new business, NexGen. These preparatory steps included designing a logo that included Cabela's colors;[43] using a Cabela's-issued computer to install "Business-in-a-Box," a tool for setting up a new business;[44] meeting with vendors at a Las Vegas trade show;[45] and developing a vision for the new business that included providing products and services to Cabela's customers.[46]

---

[41]    *Id.*

[42]    *See id.*

[43]    Cumings Aff. Ex. 27.

[44]    Stob Decl. ¶ 5.

[45]    *See* Cumings Aff. Ex. 5, at 80; *id.* Exs. 32, 33.

[46]    *Id.* Ex. 34.

In February and March 2018, the Individual Defendants started taking more concrete steps. Santero downloaded Cabela's information regarding national brands and shared that information with the other Individual Defendants.[47] Two Cabela's employees, Alex Mousel and Stacy Schumacher, left their Cabela's employment to begin working for NexGen; Mousel had worked under Santero at Cabela's, and Schumacher had worked under Nesbitt.[48] Riddle emailed a vendor he had worked with at Cabela's, asking that the vendor keep the email confidential because he was starting a new business and wanted to invite the vendor to participate.[49] In April 2018, the Sidney City Council committed eight acres of the town's industrial park for use by NexGen in exchange for NexGen's commitment to create twelve jobs and $640,000 in employee payroll.[50]

## D.    Cabela's Responds

Cabela's learned of the Individual Defendants' new business through a newspaper article.[51] Cabela's sent cease-and-desist letters to each of the Individual

---

[47]     *Id.* Ex. 39.

[48]     *Id.* Ex. 6, at 61; *id.* Ex. 36, at 18, 24; *id.* Ex. 37, at 7; *id.* Ex. 40, at 6.

[49]     *Id.* Ex. 55.

[50]     *Id.* Ex. 48.

[51]     *Id.*

Defendants in June 2018.[52]  Having received no sign from the Individual Defendants that they would halt the launch of NexGen, Cabela's filed this action in August 2018.[53]

## II.    ANALYSIS

This Court has broad discretion in granting or denying a preliminary injunction.[54]  "A preliminary injunction may be granted where the movant[] demonstrate[s]: (1) a reasonable probability of success on the merits at a final hearing; (2) an imminent threat of irreparable injury; and (3) a balance of the equities that tips in favor of issuance of the requested relief."[55]  "The moving party bears a considerable burden in establishing each of these necessary elements.  Plaintiff[] may not merely show that a dispute exists and that plaintiff[] might be injured; rather, plaintiff[] must establish clearly each element because injunctive relief 'will never be granted unless earned.'"[56]  Yet, "there is no steadfast formula for the relative

---

[52]    Cumings Aff. Ex. 49.

[53]    *See generally* Compl.

[54]    *Data Gen. Corp. v. Dig. Comput. Controls, Inc.*, 297 A.2d 437, 439 (Del. 1972) (citing *Richard Paul, Inc. v. Union Improvement Co.*, 91 A.2d 49 (Del. 1952)).

[55]    *Nutzz.com, LLC v. Vertrue Inc.*, 2005 WL 1653974, at *6 (Del. Ch. July 6, 2005).

[56]    *La. Mun. Police Emps.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1185 (Del. Ch. 2007) (quoting *Lenahan v. Nat'l Comput. Analysts Corp.*, 310 A.2d 661, 664 (Del. Ch. 1973)).

weight each deserves.  Accordingly, a strong demonstration as to one element may serve to overcome a marginal demonstration of another."[57]

**A.    Cabela's Reasonable Probability of Success on the Merits at a Final Hearing**

In its Complaint, Cabela's alleges three separate causes of action:  (1) breach of contract against the Individual Defendants, (2) violation of the Nebraska Trade Secrets Act against all Defendants, and (3) tortious interference under Nebraska law against all Defendants.

**1.    The breach of contract claim**

To succeed in its breach of contract claim, Cabela's must show that (1) a valid contract exists, (2) defendants breached an obligation under that contract, and (3) plaintiff suffered damages as a result of the breach.[58]  For its breach of contract claim, Cabela's asserts that the PMAs control regarding the noncompetition, nonsolicitation, and confidentiality provisions applicable to the Individual

---

[57]    *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *3 (citing *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998)).

[58]    *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Nebraska's requirements to show a breach of contract claim are similar to Delaware's:  On a claim for breach of contract, "the plaintiff must plead the existence of a promise, its breach, damages, and compliance with any conditions precedent that activate the defendant's duty." *Kotrous v. Zerbe*, 846 N.W.2d 122, 126 (Neb. 2014).  There is no condition precedent present here to activate the defendant's duty.  To evaluate damages for breach of contract in the context of a motion for preliminary injunction, I evaluate the imminent threat of irreparable harm. *See* Section II.B below.

Defendants' conduct.[59] The Individual Defendants argue that the PMAs are superseded by other agreements: the CIC Agreements for Wellman and Nesbitt and the Separation Agreements for Riddle and Santero.[60] Cabela's also contends that Delaware law governs the PMAs because the PMAs contain a choice-of-law provision.[61] The Individual Defendants respond that Nebraska law governs because the provisions violate Nebraska's public policy and Nebraska has a materially greater interest than Delaware in the enforcement of these provisions.[62]

### a. The PMAs control with regard to their noncompetition, nonsolicitation, and confidentiality provisions

#### i. The PMA supersedes Wellman's and Nesbitt's other agreements

Delaware recognizes that where a new, later contract between the parties covers the same subject matter as an earlier contract, the new contract supersedes and controls that issue, if the two agreements conflict.[63]

---

[59] Pl.'s Reply Br. 12.

[60] Defs.' Answering Br. 12-20.

[61] Pl.'s Reply Br. 8-12.

[62] Defs.' Answering Br. 21-28.

[63] *Country Life Homes, Inc. v. Shaffer*, 2007 WL 333075, at *5 (Del. Ch. Jan. 31, 2007) ("The new contract, as a general matter, will control over the old contract with respect to the same subject matter to the extent that the new contract is inconsistent with the old contract or if the parties expressly agreed that the new contract would supersede the old one."); *see Bioveris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at *7 n.71 (Del. Ch. Nov. 2, 2017) ("Because there is no way for a

Wellman and Nesbitt entered into their CIC Agreements in February 2016 and November 2015, respectively.[64] Section 2(e) of the CIC Agreements terminates noncompetition and nonsolicitation provisions of other agreements:

> Section 6(b) . . . of this Agreement and similar provisions *(including non-competition and non-solicitation provisions but excluding confidentiality provisions) in other agreements* between the Employee and the Company shall be terminated and of no further force and effect as of the Date of Termination, but Section 6(a) . . . of this Agreement and similar confidentiality provisions in other agreements between the Employee and the Company shall remain in full force and effect after the Date of Termination.[65]

For each grant of stock that Wellman or Nesbitt received from Cabela's, they entered into a new PMA.[66] The most recent PMAs for Wellman and Nesbitt are dated April 1, 2016, and March 15, 2016, respectively.[67] The PMAs contain the following noncompetition and nonsolicitation provisions:

---

party to comply with both dispute resolution provisions the later in time provision . . . supersedes the earlier provision . . . ." (citing *Country Life Homes*, 2007 WL 333075, at *5)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 189 (2012) (comparing canons of interpretation when a conflicting provision is adopted later in time with when conflicting provisions are adopted simultaneously).

[64] Cumings Aff. Exs. 24, 25.

[65] *Id.* Ex. 24 § 2(e) (emphasis added).

[66] *Id.* Ex. 10, at 30.

[67] *Id.* Ex. 17, at 15; *id.* Ex. 20, at 15.

**Nonsolicitation of Customers.** In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of Goodwill and other proprietary interests, Employee agrees that while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, Employee will not, directly or indirectly, on Employee's own behalf or by aiding any other individual or entity, call on, solicit the business of, sell to, service, or accept business from any of Company's customers (with whom Employee had personal contact and did business with during the eighteen (18) month period immediately prior to the termination of Employee's employment) for the purpose of providing said customers with products and/or services of the type or character typically provided to such customers by Company.[68]

**Nonsoliciation of Vendors.** In order to prevent the improper use of Trade Secrets and Confidential Information and the resulting unfair competition and misappropriation of Goodwill and other proprietary interests, Employee agrees that while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, Employee will not, directly or indirectly, on Employee's own behalf or by aiding any other individual or entity:

(a) Encourage, discourage, interfere with, or otherwise cause, in any manner, any business partner, independent contractor, vendor, or supplier of

---

[68] *Id.* Ex. 17 § 4.

Company to curtail, sever, or alter its relationship or business with Company; or

(b) Solicit, communicate, or do business with any of Company's business partners, independent contractors, vendors, or suppliers (with whom Employee had personal contact and did business with during the eighteen (18) month period immediately prior to the termination of Employee's employment) for or on behalf of a Competitor . . . .[69]

**Nonsoliciation of Employees.** Employee agrees that while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, Employee will not, directly or indirectly, on Employee's own behalf or by aiding any other individual or entity, hire, employ, or solicit for employment any employee of Company with whom Employee had personal contact or about whom Employee received Confidential Information while employed by Company or any of its affiliates.[70]

**Noncompetition.** In order to prevent the improper use of Trade Secrets and Confidential Information and the resulting unfair competition and misappropriation of Goodwill and other proprietary interests, Employee agrees that while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, Employee will not, directly or indirectly, perform services within the United States of America or Canada for a Competitor that are the same as or similar to the services

---

[69]    *Id.* § 5.

[70]    *Id.* § 6.

Employee performed for Company during the eighteen (18) month period immediately prior to the termination of Employee's employment. For purposes of this Agreement, a "Competitor" of Company shall mean [specific, named competitor businesses], or any other multi-state, multi-province, and/or multi-channel retailer engaged in the sale of products and/or services associated with hunting, fishing, or camping.[71]

Wellman and Nesbitt argue that their CIC Agreements supersede the noncompetition and nonsolicitation provisions of their PMAs.[72] This argument fails. The PMAs from March and April 2016 are later in time than the November 2015 and February 2016 CIC Agreements.[73] Therefore, where the PMAs cover the same subject matter as the CIC Agreements and the two agreements conflict, the PMAs supersede and control that issue. The noncompetition and nonsolicitation provisions of Wellman's and Nesbitt's PMAs, which conflict with Section 2(e) of the CIC Agreements, thus control to the extent they are valid under governing law. Other terms of the CIC Agreements that do not conflict with the PMAs remain in effect.

Wellman and Nesbitt also argue that Cabela's SEC Form 8-K dated October 3, 2016, provides that the provisions of the CIC Agreements would be enforced.[74]

---

[71]   *Id.* § 7.

[72]   Defs.' Answering Br. 15-17.

[73]   *Compare* Cumings Aff. Exs. 17, 20, *with id.* Exs. 24, 25.

[74]   Defs.' Answering Br. 16-17.

Section 5.11 of the Form 8-K states that Cabela's will "honor . . . the Company's . . . employment, severance, retention and termination plans, policies, programs, agreements and arrangements (including any *change in control or severance agreement* between the Company . . . and any Company Employee), in each case, in accordance with their terms as *in effect immediately prior to*" the merger with Bass Pro.[75]  Here, Section 2(e), a term of the CIC Agreements, was not in effect in October 2016, when the Form 8-K was filed, or immediately prior to the merger because it was superseded by the relevant provisions of the PMAs in March and April 2016.

### ii.    The Santero Separation Agreement preserves the terms of Santero's PMA

Section 17 of the Santero Separation Agreement states,

> This Agreement is a complete agreement between the parties and supersedes all prior discussion, negotiations, and agreements *with regard to the subject matter herein*, whether oral or written.  However, Employee agrees that this Agreement shall not in any way affect, modify, or nullify any agreement(s) Employee may have entered into with Cabela's that obligate Employee to protect Cabela's confidential information and/or to refrain from soliciting Cabela's employees or customers after Employee's employment is terminated, . . . and that any such obligations contained *in those agreement(s)* remain in full force and effect to the extent permitted by law.[76]

---

[75]    Akhimien Aff. Ex. 62E, at 58 (emphases added).

[76]    Cumings Aff. Ex. 26 § 17 (emphases added).

The Santero Separation Agreement preserves the confidentiality, nonsolicitation-of-employees, and nonsolicitation-of-customers provisions of the PMA. Santero argues that the nonsolicitation-of-vendors and noncompetition provisions of the PMA are superseded by Section 17 of his Separation Agreement.[77] None of the Separation Agreement's terms refer to nonsolicitation-of-vendors or noncompetition obligations.[78] These obligations, therefore, are not part of the "subject matter" of the Separation Agreement, and the Separation Agreement does not supersede the relevant provisions of the PMA. The confidentiality, nonsolicitation, and noncompetition provisions of the PMA, therefore, remain in effect to the extent they are valid under governing law.

### iii. The Riddle Separation Agreement preserves the terms of Riddle's PMA

Section 14 of the Riddle Separation Agreement states,

> This Agreement constitutes the entire agreement between the Company and [Riddle] *with respect to the issues addressed in this Agreement*, except this Agreement does not in any way affect, modify, or nullify any prior agreement [Riddle] entered into with the Company regarding *confidentiality, trade secrets, intellectual property, or unfair competition.*[79]

---

[77] Defs.' Answering Br. 18-20.

[78] *See* Cumings Aff. Ex. 26.

[79] Cumings Aff. Ex. 22 § 14 (emphases added).

18

The Riddle Separation Agreement preserves the confidentiality provision of Riddle's PMA. Riddle argues that the nonsolicitation and noncompetition provisions of the PMA are superseded by Section 14 of his Separation Agreement.[80] The Riddle Separation Agreement preserves "any prior agreement [he] entered into . . regarding . . . unfair competition."[81] To the extent that the noncompetition provision of the PMA covers unfair competition, the Riddle Separation Agreement preserves that provision. The Riddle Separation Agreement's terms do not refer to any obligations related to ordinary (or not unfair) competition; to the extent that the noncompetition provision of the PMA covers ordinary competition, the Separation Agreement does not supersede the noncompetition provision of the PMA.

Further, none of the Riddle Separation Agreement's terms refer to any nonsolicitation obligations.[82] These obligations, therefore, are not "issues addressed in" the Riddle Separation Agreement, and the Separation Agreement does not supersede the relevant provisions of the PMA.

The confidentiality, nonsolicitation, and noncompetition provisions of the PMA, therefore, remain in effect to the extent they are valid under governing law.

---

[80] Defs.' Answering Br. 18-20.

[81] Cumings Aff. Ex. 22 § 14.

[82] *See* Cumings Aff. Ex. 22.

19

#### iv. The Cash Incentive Agreements do not supersede the PMAs

The Individual Defendants argue in the alternative that the Cash Incentive Agreements superseded the noncompetition and nonsolicitation provisions of the PMAs.[83] The Cash Incentive Agreements dated March 2, 2017, "supersede[] all other oral or written agreements or understandings, between [the employee] and the Company regarding the subject matter hereof."[84] None of the Cash Incentive Agreements' terms refer to noncompetition or nonsolicitation obligations.[85] These obligations, therefore, are not part of the "subject matter" of the Cash Incentive Agreements, and the Cash Incentive Agreements do not supersede the relevant provisions of the PMAs.[86]

### b. Nebraska law governs the PMAs

In the PMAs, Cabela's and the Individual Defendants agreed to a Delaware choice-of-law provision.[87] When evaluating choice-of-law provisions, Delaware

---

[83]    Defs.' Answering Brief 18.

[84]    Akhimien Aff. Exs. 63A, 64A, 65A, 66A.

[85]    *See* Akhimien Aff. Exs. 63A, 64A, 65A, 66A.

[86]    The Individual Defendants further argue that the PMAs are not valid agreements because the Individual Defendants electronically signed and accepted the terms of the PMAs. This argument fails because Delaware law allows digital acceptance of the terms of an agreement. *Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *6-8 (Del. Ch. Mar. 27, 2014).

[87]    *See, e.g.*, Cumings Aff. Ex. 17 § 16(b).

follows the Restatement (Second) of Conflict of Laws (the "Restatement").[88]  Under

the Restatement, the parties' choice of law generally will control an agreement.[89]

The Restatement, however, recognizes an exception to that general principal.  Where

the parties enter a contract which, except for the choice-of-law provision, would be

governed by the law of a particular state, and that state has a public policy under

which a contractual provision would be limited or void, "the Restatement recognizes

that allowing the parties to contract around that public policy would be an

unwholesome exercise of freedom of contract."[90]  "[A]llowing parties to circumvent

state policy-based contractual prohibitions through the promiscuous use of [choice-

of-law] provisions would eliminate the right of [other] state[s] to have control over

enforceability of contracts concerning [their] citizens."[91]

---

[88]  *Ascension Ins. Hldgs, LLC v. Underwood*, 2015 WL 356002, at *2 (Del. Ch. Jan. 28, 2015) (citing *Total Hldgs. USA, Inc. v. Curran Composites, Inc.*, 999 A.2d 873, 881-82 (Del. Ch. 2009); *Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1032 & n.16 (Del. Ch.), *aff'd*, 894 A.2d 407 (Del. 2005); *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1047 (Del. Ch. 2006)); *accord DCS Sanitation*, 435 F.3d at 895 (explaining that Nebraska follows the Restatement (Second) of Conflict of Laws).

[89]  Restatement § 187(1) (providing that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue").

[90]  *Ascension*, 2015 WL 356002, at *2 (citing Restatement § 187).

[91]  *Id.*

Here, Cabela's, a corporation with its headquarters in Nebraska, entered into agreements with its employees, residents of Nebraska.[92] The employees worked in Nebraska, and the parties entered into the agreement in Nebraska.[93] Other than the choice-of-law provision in the PMAs, the only connections to Delaware are (1) Cabela's is a Delaware corporation and (2) the Individual Defendants signed the PMAs as a condition to receive Delaware stock.[94] Nebraska is the state with the strongest contacts to the contract; in the absence of the Delaware choice-of-law provision, Nebraska law would apply to the PMAs.[95] As a result, the Restatement instructs that I first determine whether enforcement of the noncompete provision would conflict with a fundamental policy of Nebraska. If so, then I must also determine whether Nebraska has a materially greater interest in the enforcement of

---

[92] Compl. ¶¶ 1, 10, 12-15; *see* Cumings Aff. Exs. 17-20.

[93] Cumings Aff. Ex. 21, at 45-47.

[94] Oral Arg. Tr. 24:21-24.

[95] *Ascension*, 2015 WL 356002, at *3; Restatement § 188(2) (listing contacts to evaluate when determining the law applicable to an issue); *accord DCS Sanitation*, 435 F.3d at 896 (8th Cir. 2006) (finding a substantial relationship to Nebraska when the parties entered into the agreement in Nebraska, the services at issue occurred in Nebraska, the former employees reside in Nebraska, enforcement of the noncompete affects employment in Nebraska, and the former employer does business in Nebraska).

the PMAs than Delaware. If both these conditions are met, then Nebraska law will apply despite the PMAs' choice-of-law provision.[96]

Nebraska law has long recognized that all contracts in restraint of trade or commerce are against public policy and void.[97] "A restraint on the employee is illegal [in Nebraska] when its purpose is the prevention of competition . . . ."[98] Ordinary competition may not be constrained.[99] In other words, an employer cannot prevent its former employee from using any general knowledge, skill, or facility acquired on the job as an edge for ordinary competition.[100] Nebraska, however, does allow for a narrow exception: An employer may protect itself from a former

---

[96]   *See Ascension*, 2015 WL 356002, at *3; Restatement § 187(2)(b).

[97]   *Gaver v. Schneider's O.K. Tire Co.*, 856 N.W.2d 121, 127 (Neb. 2014); *see also* Neb. Rev. Stat. § 59-1603.

[98]   *Chambers-Dobson, Inc. v. Squier*, 472 N.W.2d 391, 398 (Neb. 1991) (quoting 6A A. Corbin, *Corbin on Contracts* § 1394, at 100 (1962)); *see, e.g.*, *Gaver*, 856 N.W.2d at 133 ("By attempting to restrict Gaver from opening or having an ownership interest in a competing business not coupled with a recognized protectable interest [of the former employer], [the former employer] is attempting to prevent ordinary competition by a former employee, not unfair competition.").

[99]   *See Chambers-Dobson*, 472 N.W.2d 391 at 398-99; *Gaver*, 856 N.W.2d at 127; *Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc.*, 748 N.W.2d 626, 638 (Neb. 2008); *Polly v. Ray D. Hilderman & Co.*, 407 N.W.2d 751, 755 (Neb. 1987); *Boisen v. Petersen Flying Serv., Inc.*, 383 N.W.2d 239, 245 (Neb. 1986).

[100]  *Gaver*, 856 N.W.2d at 131 (quoting *Boisen*, 383 N.W.2d at 34); Restatement (Second) of Contracts § 188 cmt. g (Am. Law Inst. 1981) ("A line must be drawn between the general skills and knowledge of the trade and information that is peculiar to the employer's business.").

employee's improper or unfair competition.[101] Nebraska courts have held that improper or unfair competition includes misappropriation of the employer's (1) goodwill by soliciting the employer's customers when the employee had substantial personal contact with the employer's customers, (2) confidential information, or (3) trade secrets.[102]

Delaware law, to the contrary, allows a much broader range of noncompete agreements. Noncompete agreements that are "reasonable in scope and duration, . . . advance a legitimate economic interest of the [former employer], and . . . survive a

---

[101]    *Gaver*, 856 N.W.2d at 130; *Aon Consulting*, 748 N.W.2d at 638; *Polly*, 407 N.W.2d at 755; *Boisen*, 383 N.W.2d at 245.

[102]    *E.g.*, *Gaver*, 856 N.W.2d at 130-31 ("Legitimate interests of an employer which may be protected from competition include: the employer's trade secrets which have been communicated to the employee during the course of employment; [and] confidential information communicated by the employer to the employee . . . ." (quoting 54A Am. Jur. 2d *Monopolies and Restraints of Trade* § 906, at 208 (2009))); *Aon Consulting*, 748 N.W.2d at 638 ("The nonsolicitation agreement signed by Pearson did not prevent him from engaging in 'ordinary competition' with Aon after leaving its employment. It only prevented him from business contacts with those customers with whom he had personal business dealings during the last 2 years of his employment with Aon."); *id.* ("To distinguish between 'ordinary competition' and 'unfair competition,' [Nebraska courts] have focused on an employee's opportunity to appropriate the employer's goodwill by initiating personal contacts with the employer's customers. Where an employee has substantial personal contact with the employer's customers, develops goodwill with such customers, and siphons away the goodwill under circumstances where the goodwill properly belongs to the employer, the employee's resultant competition is unfair and the employer has a legitimate need for protection against the employee's competition.").

balance of the equities" are enforced in Delaware.[103]  Cabela's argues that the Nebraska courts' interpretation of reasonable noncompete agreements is "consistent" with Delaware's requirement of reasonableness.[104]  But this argument does not withstand scrutiny.  An agreement prohibiting ordinary competition is enforced in Delaware so long as the agreement is not "oppressive to an employee,"[105] but the same agreement is void in Nebraska precisely because the agreement prohibits ordinary competition.[106]

Cabela's also argues that Nebraska's public policy against restrictions on trade or commerce is not strong because it is not defined by a statute, but instead by common law.  This argument is wrong.  First, Nebraska's policy is set out, albeit briefly, in statute:  "Any contract . . . in restraint of trade or commerce shall be

---

[103]   *Weichert Co. v. Young*, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007).

[104]   Oral Arg. Tr. 26:19-22.

[105]   *EDIX Media Gp. v. Mahani*, 2006 WL 3742595, at *7-8 (Del. Ch. Dec. 12, 2006) (enforcing agreement as to actions that compete directly with plaintiff's business activities); *see also Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *6, 14-15 (Del. Ch. Jan. 17, 2007) (enforcing noncompete agreement against ordinary competition); *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *6, 15 (Del. Ch. Oct. 23, 2002) (same).

[106]   *Compare Gaver*, 856 N.W.2d at 125-27 (holding that noncompete agreement regarding "any trade business similar to the business owned and operated by Employer" is unenforceable), *with Hough Assocs.*, 2007 WL 148751, at *6, 14-15 (holding that noncompete agreement regarding "any business which is similar to the business conducted by the Company" is enforceable).

25

unlawful."[107]  Second, I am unaware of, and Plaintiff does not cite, any authority to support the proposition that public policy is strong only when it is enshrined in a statute.  To the contrary, for example, Delaware's strong public policy regarding right to freedom of contract is not set out in statute but is abundantly supported by case law.

As I explained above, noncompete agreements are allowed by Nebraska law only to the extent they protect the employer against improper and unfair competition such as misappropriation of goodwill, confidential information, or trade secrets.[108] Any noncompete agreement prohibiting ordinary competition is contrary to a fundamental policy of Nebraska.[109]  Here, the noncompete provision in the PMAs prohibits the employee from performing services for a competitor that are the same as or similar to the services the employee performed for Cabela's during the eighteen-month period immediately prior to the termination of the employee's employment.[110]  "For purposes of [the PMAs], a 'Competitor'" means any "multi-

---

[107]    Neb. Rev. Stat. § 59-1603.  *Compare id.*, *with* Cal. Bus. & Prof. Code § 16600 ("Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.").

[108]    *See supra* note 101.

[109]    *Gaver*, 856 N.W.2d at 127.

[110]    Cumings Aff. Ex. 17 § 7.

26

state, multi-province, and/or multi-channel retailer engaged in the sale of products and/or services associated with hunting, fishing, or camping."[111] This provision is a prohibition of ordinary competition and, thus, is in conflict with a fundamental policy of Nebraska.[112]

I must next determine whether Nebraska's specific interest is materially greater than Delaware's general interest in enforcing a contract that has no substantial relationship to this state. "Upholding freedom of contract is a fundamental policy of this State."[113] "[W]here Delaware's law applies, with very limited exceptions, our courts will enforce the contractual scheme that the parties have arrived at through their own self-ordering, both in recognition of a right to self-order and to promote certainty of obligations and benefits."[114] But "where it is clear

---

[111]    *Id.*

[112]    *E.g.*, *DCS Sanitation*, 435 F.3d 892 at 894, 897 (affirming district court's holding that noncompete agreement was overbroad and unenforceable when noncompete agreement stated "For a period of one (1) year following the date of termination of employment for any reason, I will not directly or indirectly engage in, or in any manner be concerned with or employed by any person, firm, or corporation in competition with [DCS] or engaged in providing contract cleaning services within a radius of one-hundred (100) miles of any customer of [DCS] or with any customer or client of [DCS] or any entity or enterprise having business dealings with [DCS] which is then providing its own cleaning services in-house or which requests my assistance or knowledge of contract cleaning services to provide its own cleaning services in-house" (alterations in original)).

[113]    *Ascension*, 2015 WL 356002, at *4 (citing *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009)).

[114]    *Id.*

that the policy of [Nebraska] is that the contract at issue is abhorrent and void, and where, as here, the formation and enforcement of the contract relate overwhelmingly to [Nebraska], a general interest in freedom of contract is unlikely to be the equal of that public policy under the Restatement analysis."[115] Because Nebraska has a greater material interest in the agreements and application of Delaware law would violate a fundamental policy of Nebraska law, I apply Nebraska law to the question of the validity and enforceability of the nonsolicitation and noncompete provisions of the PMAs.[116]

### c. Validity of the confidentiality, nonsolicitation, and noncompete provisions of the PMAs

### i. The confidentiality provision

The Defendants do not argue that the confidentiality provision of the PMAs is unenforceable or void under Nebraska law. Nor can they; Nebraska law identifies confidential information as a legitimate protectable business interest.[117]

---

[115]   *Id.* at *5; *see Gaver*, 856 N.W.2d at 127 ("[A]ll contracts in restraint of trade are against public policy and void."); *accord DCS Sanitation Mgmt.*, 435 F.3d at 897 (holding that reformation of an overbroad noncompete agreement violates a fundamental policy of Nebraska law).

[116]   *DCS Sanitation*, 435 F.3d at 897; *Aon Consulting*, 748 N.W.2d at 638.

[117]   *Gaver*, 856 N.W.2d at 130 ("We have identified legitimate protectable business interests as including employer's goodwill, confidential information, and trade secrets."); *Boisen*, 383 N.W.2d at 34 ("[A]n employer has a legitimate need to curb or prevent competitive endeavors by a former employee who has acquired confidential information or trade secrets pertaining to the employer's business operations." (citing *Brewer v. Tracy*, 253 N.W.2d 319, 321 (Neb. 1977))).

28

## ii. The nonsolicitation provisions

Under Nebraska law, nonsolicitation provisions are valid if they focus on the former employee's personal contacts with the employer's customers.[118] Nebraska courts will enforce a nonsolicitation provision that prohibits the former employee from soliciting those customers with whom the employee had personal contact.[119]

The PMAs prohibit the solicitation of customers, vendors, and employees. The Individual Defendants are prohibited from soliciting customers "with whom [they] had personal contact and did business with during the eighteen (18) month period immediately prior to the termination of [their] employment."[120] Because the provision is limited to those customers with whom the employee had personal contact, it legitimately protects Cabela's goodwill and is enforceable under Nebraska law.

Similarly, the PMAs prohibit the Individual Defendants from soliciting vendors or suppliers "with whom Employee had personal contact and did business with during the eighteen (18) month period immediately prior to the termination of

---

[118] *Aon Consulting*, 748 N.W.2d at 638 (citing *Moore v. Eggers Consulting Co.*, 562 N.W.2d 534 (Neb. 1997); *Boisen*, 383 N.W.2d 29).

[119] *E.g.*, *Aon Consulting*, 648 N.W.2d at 638.

[120] Cumings Aff. Ex. 17 § 4.

Employee's employment."[121]  For the same reasons above, this provision protects Cabela's legitimate business interest and is enforceable under Nebraska law.

Finally, the PMAs prohibit the Individual Defendants from soliciting Cabela's employees "with whom Employee had personal contact or about whom Employee received Confidential Information while employed by [the] Company."[122]  Again, this provision protects Cabela's legitimate business interest and is enforceable under Nebraska law.  The three nonsolicitation provisions are enforceable here.[123]

### iii.    The noncompetition provision

Under Nebraska law, noncompete agreements are allowed only to the extent they protect the employer against unfair competition.[124]

> To distinguish between "ordinary competition" and "unfair competition," [Nebraska courts] have focused on an employee's opportunity to appropriate the employer's goodwill by initiating personal contacts with the employer's customers.  Where an employee has substantial personal contact with the employer's customers, develops goodwill with such customers, and

---

[121]    *Id.* § 6.

[122]    *Id.*

[123]    Nebraska law requires that nonsolicitation agreements be no greater than reasonably necessary to protect the employer's legitimate business interest.  Under this requirement, nonsolicitation agreements must be reasonably limited in duration. *See Aon Consulting*, 748 N.W.2d at 653-54.  The parties do not address whether the nonsolicitation provision's duration is reasonable.  I, therefore, do not address this issue.

[124]    *See supra* note 101.

30

siphons away the goodwill under circumstances where the goodwill properly belongs to the employer, the employee's resultant competition is unfair and the employer has a legitimate need for protection against the employee's competition.[125]

Any noncompete agreement prohibiting ordinary competition is void.[126] "[A]n employer does not ordinarily have a legitimate business interest in the postemployment preclusion of an employee's use of some general skill."[127] Further, "an employer has no legitimate business interest in post-employment prevention of an employee's use of some general skill or training acquired while working for the employer, although such on-the-job acquisition of general knowledge, skill, or facility may make the employee an effective competitor for the former employer."[128]

Here, the noncompete provision in the PMAs prohibits the employee from performing services for a competitor that are the same as or similar to the services the employee performed for Cabela's during the eighteen-month period immediately prior to the termination of the employee's employment.[129]  "For purposes of [the

---

[125]    *Aon Consulting*, 748 N.W.2d at 638 (footnote omitted) (citing *Moore*, 562 N.W.2d 534; *Boisen*, 383 N.W.2d 29; *Schuelke v. Wilson*, 587 N.W.2d 369 (Neb. 1998)).

[126]    *Gaver*, 856 N.W.2d at 127.

[127]    *Id.* at 131 (citing *Moore*, 562 N.W.2d 534).

[128]    *Id.* (quoting *Boisen*, 562 N.W.2d at 34).

[129]    Cumings Aff. Ex. 17 § 7.

31

PMAs], a 'Competitor'" means any "multi-state, multi-province, and/or multi-channel retailer engaged in the sale of products and/or services associated with hunting, fishing, or camping."[130]

"[P]erform[ing] services . . . that are the same as or similar to the services . . . performed for [the] Company" precludes the use for a competitor of the employee's general skills.[131] Because the Individual Defendants may not work for "any other multi-state, multi-province, and/or multi-channel retailer engaged in the sale of products and/or services associated with hunting, fishing, or camping," the PMAs' noncompetition provision is a prohibition of ordinary competition and is unreasonable under Nebraska law.[132]

"[The Supreme Court of Nebraska] has long held that it is not the function of the courts to reform a covenant not to compete in order to make it enforceable."[133]

---

[130] *Id.*

[131] *Id.*

[132] *Id. Compare id.*, *with Gaver*, 856 N.W.2d at 125 ("any trade business similar to the business owned and operated by Employer").

[133] *H & R Block Tax Servs., Inc. v. Circle A Enters., Inc.*, 693 N.W.2d 548, 552 (Neb. 2005) (citing *CAE Vanguard, Inc. v. Newman*, 518 N.W.2d 652 (Neb. 1994); *Brockley v. Lozier Corp.*, 488 N.W.2d 556 (Neb. 1992); *Vlasin v. Len Johnson & Co.*, 455 N.W.2d 772 (1990); *Philip G. Johnson & Co. v. Salmen*, 317 N.W.2d 900 (Neb. 1982)).

Nebraska courts either enforce the provision as written or not at all.[134] Because the noncompete provision in the PMAs is unreasonable, under Nebraska law, I cannot enforce the provision, nor can I reform it.

### d. The Individual Defendants' breaches of the PMAs

Cabela's alleges that the Individual Defendants breached the nonsolicitation, confidentiality, and noncompetition provisions of the PMAs. I address only the allegations regarding the nonsolicitation and confidentiality provisions as I cannot enforce the noncompetition provision under Nebraska law.

Cabela's accuses the Individual Defendants of collectively contacting at least thirteen vendors with whom Cabela's has done business in violation of the nonsolicitation-of-vendors provision.[135] For example, Cabela's provides evidence that Riddle contacted at least one vendor "with whom [he] had personal contact and did business with."[136] Riddle reached out via email to his old Cabela's contact at Ten Point Crossbows.[137] He asked in that email that the vendor keep the email confidential because he was starting a new business and wanted to invite the vendor

---

[134]   *H & R Block*, 693 N.W.2d at 552 (quoting *CAE Vanguard*, 518 N.W.2d at 656).

[135]   Pl.'s Opening Br. 39.

[136]   Cumings Aff. Ex. 17 § 5(b).

[137]   *Id.* Ex. 55; *see also id.* Ex. 5, at 148-49.

to participate.[138] Based on this evidence, I find that Cabela's has demonstrated a reasonable probability it can show at the final hearing that the Individual Defendants breached the nonsolicitation-of-vendors provision of his PMA.

Cabela's also alleges that the Individual Defendants violated the nonsolicitation-of-employees provision of the PMAs. Two Cabela's employees, Alex Mousel and Stacy Schumacher, left their Cabela's employment to begin working for NexGen; Mousel worked directly under Santero at Cabela's, and Schumacher under Nesbitt.[139] This evidence shows Cabela's has a reasonable probability of proving that the Individual Defendants breached the nonsolicitation-of-employees provision of the PMAs.

Cabela's alleges violations of the confidentiality provisions of the PMAs. By signing the PMAs, the Individual Defendants each agreed that he "shall not directly or indirectly disclose to any person or entity or use for any purpose or permit the exploitation, copying, or summarizing of any Confidential Information of [the] Company, except as specifically required in the proper performance of [his] duties for [the] Company."[140] Cabela's provides evidence that the Individual Defendants

---

[138]    *Id.* Ex. 55.

[139]    *Id.* Ex. 6, at 61; *id.* Ex. 36, at 18, 24; *id.* Ex. 37, at 7; *id.* Ex. 40, at 6.

[140]    *Id.* Ex. 17 § 1(b); *see supra* note 16 (quoting the PMAs' definition of "Confidential Information").

sent Cabela's confidential documents to their personal email accounts for non-Cabela's use and that they used a thumb drive to save confidential information for non-Cabela's use. First, Cabela's alleges that Riddle forwarded Cabela's "new vendor" form from his personal email address.[141] Second, Santero emailed a Cabela's "top brands" spreadsheet to the other three Individual Defendants.[142] Third and finally, Cabela's alleges that Riddle has retained other confidential information, including copies of Cabela's weekly reports.[143] The Company's evidence supporting these allegations is based in part on Riddle's own deposition testimony.[144]

The Individual Defendants argue that the information Cabela's claims is confidential (1) is not, in fact, confidential information[145] or (2) is irrelevant to NexGen's business.[146] I need not determine at this stage whether each document is

---

[141] Pl.'s Opening Br. 42.

[142] *Id.*; Cumings Aff. Ex. 39.

[143] Pl.'s Opening Br. 43; Cumings Aff. Ex. 5, at 53.

[144] *E.g.*, Cumings Aff. Ex. 5, at 41, 53.

[145] Defs.' Answering Br. 38-39 (pricing information), 41 (shipping methods), 42 (market information), 42 (customer lists), 43-44 (vendor information).

[146] *Id.* at 39-40 (buying practices), 41 (marketing plans, including merchandise plan inventory), 43-44 (vendor information). Where the Individual Defendants concede the confidential nature of the information but dispute their use of the information, their argument is irrelevant. The confidentiality provision of the PMAs prohibits the unauthorized disclosure of confidential information "for any purpose." Cumings Aff. Ex. 17 § 1(b).

confidential; I need only determine whether there is a reasonable probability that Cabela's will succeed in its claim that these documents, or a portion of them, are confidential. The documents at issue include Cabela's (1) vendor lists with associated sales data and (2) pricing information and margins. This information is arguably confidential and the use of this information by NexGen may be unfair competition because NexGen would be using information unique to Cabela's to promote NexGen's business.

I find that Cabela's has shown a reasonable probability of success on the merits of its claim that the Individual Defendants have breached the nonsolicitation and confidentiality provisions of the PMAs.

## 2. The Nebraska Trade Secrets Act claim

Cabela's alleges that the Individual Defendants and NexGen violated the Nebraska Trade Secrets Act[147] by misappropriating and misusing Cabela's trade secrets.[148] "[M]uch of the confidential information of Cabela's as defined in the PMA constitutes its trade secrets."[149]

In connection with the confidentiality provision of the PMAs, Cabela's requests that this Court enjoin the Individual Defendants from using or disclosing

---

[147] Neb. Rev. Stat. §§ 87-501 to -507.

[148] Compl. ¶ 56.

[149] *Id.* ¶ 53.

the Company's confidential information. This relief also addresses potential continuing misappropriation and misuse of Cabela's trade secrets. I need not separately address the merits of Cabela's second cause of action as to the Individual Defendants.

For this Court to enjoin NexGen, Cabela's must demonstrate a reasonable probability of success on the merits. NexGen is a small company, and the four Individual Defendants are intimately involved in every aspect of the company.[150] The Individual Defendants have confidential information from Cabela's, and Cabela's has shown, through the Individual Defendants' own statements, that the Individual Defendants intend to use Cabela's potential trade secrets to benefit NexGen.[151] This evidence is sufficient to show Cabela's reasonable probability of success on the merits against NexGen.

### 3. The tortious interference claim

Cabela's argues that the Individual Defendants and NexGen tortiously interfered with Cabela's business relationships with its employees. For example, Cabela's argues that by inducing Alex Mousel and Stacy Schumacher to leave

---

[150] *See* Cumings Aff. Ex. 37, at 5; *id.* Ex. 40, at 6.

[151] *See, e.g.*, *id.* Ex. 7.

Cabela's and join NexGen, the Individual Defendants and NexGen induced the two employees to breach his or her PMA with Cabela's.[152]

In connection with its tortious interference claim, Cabela's requests that this Court enjoin the Individual Defendants from hiring, employing, or soliciting for employment any Cabela's employee with whom the Individual Defendants had personal contact or about whom the Individual Defendants received Confidential Information. Enforcement of the nonsolicitation provision of the PMAs addresses Cabela's request for relief as to the Individual Defendants. I therefore need not separately address the merits of Cabela's third cause of action.

NexGen, through the Individual Defendants, has induced former Cabela's employees to breach various provisions of the PMAs and other agreements. This inducement is sufficient for Cabela's to demonstrate a reasonable probability of success on the merits of its claim against NexGen.

### B.    Imminent Threat of Irreparable Harm

"Harm is irreparable unless 'alternative legal redress [is] clearly available and [is] as practical and efficient to the ends of justice and its prompt administration as the remedy in equity.'"[153]  "Damages would not adequately compensate Plaintiff[]

---

[152]    Pl.'s Opening Br. 25-26, 51.

[153]    *Destra Targeted Income Unit Inv. Tr. v. Parmar*, 2017 WL 373207, at *2 (Del. Ch. Jan. 25, 2017) (alterations in original) (quoting *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000)).

for a breach of the confidentiality provisions because the purpose of such provisions is to prevent harm and misuse before it occurs."[154] "[W]here an employee has agreed . . . that he will not divulge or disclose to his employer's detriment any trade secrets or other confidential information which he has acquired in the course of his employment, the employer is entitled to an injunction against a threatened use or disclosure of such confidential information . . . ."[155]

Here, Cabela's has adequately shown that the Individual Defendants and NexGen are attempting to use the confidential information the Individual Defendants obtained as Cabela's employees. Allowing such use subjects Cabela's to unfair competition and irreparable harm.

Additionally, this Court has held that contractual stipulations as to irreparable harm may suffice to establish that element for the purpose of issuing preliminary injunctive relief.[156] The Individual Defendants agreed in the PMAs that "a breach of any of the . . . agreements contained [in the PMA] will result in irreparable and

---

[154] *Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *20 (Del. Ch. Aug. 4, 2006) (citing *T. Rowe Price Recovery Fund*, 770 A.2d at 557 n.66; *E.I. du Pont de Nemours & Co. v. Am. Potash & Chem. Corp.*, 200 A.2d 428, 431 (Del. Ch. 1964)).

[155] *E. I. duPont de Nemours*, 200 A.2d at 431.

[156] *Cirrus Hldg. Co. Ltd. v. Cirrus Indus., Inc.*, 794 A.2d 1191, 1209 (Del. Ch. 2001) (citing *True N. Commc'ns Inc. v. Publicis S.A.*, 711 A.2d 34, 44 (Del. Ch. 1997); *Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.*, 1997 WL 458494, at *9-10 (Del. Ch. Aug. 7, 1997)).

continuing damage to [the] Company."[157]  This stipulation is sufficient to show irreparable harm under the circumstances of this case related to breaches of the nonsolicitation and confidentiality provisions.

### C.    Balance of the Equities

Cabela's argues that the balance of the equities favors Cabela's because the Individual Defendants received valuable stock in exchange for the confidentiality, nonsolicitation, and noncompetition provisions of the PMAs.[158]  Failure to enforce these provisions would deny Cabela's the benefit of the parties' bargain.  The Individual Defendants respond by arguing that the economic loss that will be suffered by the Individual Defendants, NexGen employees, and the City of Sidney will outweigh any harm to Cabela's, which, according to Defendants, would be negligible.[159]

As discussed above, the confidentiality and nonsolicitation provisions of the PMAs serve to protect Cabela's legitimate business interest.  The Individual Defendants received Company stock in exchange for their voluntary agreement to the provisions.  By seeking to enforce the terms of those provisions, Cabela's has

---

[157]    Cumings Aff. Ex. 7 § 12.

[158]    Pl.'s Opening Br. 56-57.

[159]    Defs.' Reply Br. 51-53.

40

not exceeded the scope of its legitimate business interests.[160] I conclude, therefore, that, on balance, there is nothing inequitable in allowing Cabela's to enforce the confidentiality and nonsolicitation provisions.

I conclude that Cabela's has satisfied the requisite elements for injunctive relief, and I GRANT in part its Motion for a Preliminary Injunction.

## III. BOND

Court of Chancery Rule 65(c) provides that "[n]o . . . preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." "The security, usually a bond, fixes the maximum amount that an enjoined party may recover. . . . Because actual damages are uncertain, and because a wrongfully enjoined party has no recourse other than the security, the court should 'err on the high side' in setting the bond."[161] The party seeking the bond, however, must support its application with "facts of record or . . . some realistic as opposed to a yet-unproven legal theory from which damages could flow to the party

---

[160] *See Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at \*20 (Del. Ch. July 22, 2015).

[161] *Guzzetta v. Serv. Corp. of Westover Hills*, 7 A.3d 467, 470 (Del. 2010) (citing *Coyne-Delany Co., Inc. v. Capital Dev. Bd.*, 717 F.2d 385, 393 (7th Cir. 1983)).

enjoined."[162] "[T]he amount of a bond is a matter of discretion," but there must be a "credible basis for the estimated damages."[163]

Because NexGen is new and has no significant financial history, it is difficult to estimate the costs and damages it may incur during the pendency of the preliminary injunction. NexGen has created profit and loss estimates for the second half of 2018 and for 2019.[164] NexGen estimates its total gross profits for the second half of 2018 at $1,011,360 and for 2019 at $1,518,461.28. If NexGen continues as a business in the face of this preliminary injunction, it will continue to have expenses but will be prevented from generating income and building its business through contacts the Individual Defendants made while at Cabela's.

NexGen's launch is currently set for October 29, 2018. To simplify my calculations, I assume a launch date of November 1, 2018. To "err on the high side," I set the bond at an amount equal to two months' gross profits for 2018 and all gross profits for 2019, or $1,855,581.28.[165]

---

[162] *Id.* (omission in original) (quoting *Petty v. Penntech Papers, Inc.*, 1975 WL 7481, at *1 (Del. Ch. Sept. 24, 1975)).

[163] *Id.* at 471.

[164] Cumings Aff. Ex. 38.

[165] The portion of the bond representing two months' gross profits for 2018 is $1,011,360 divided by six months and then multiplied by two months.

42

## IV. CONCLUSION

For the foregoing reasons, I conclude that Cabela's has satisfied the requisite elements for injunctive relief, and I GRANT in part its Motion for a Preliminary Injunction as to the use of Cabela's confidential information and as to solicitation of Cabela's vendors, employees, or customers. Plaintiff shall submit a proposed implementing form of order and post a bond in the amount of $1,855,581.28 within five days of this opinion.

**IT IS SO ORDERED.**